Todd A. Lubben, 800 Market St. Ste. 1100, St. Louis, MO 63101, For Appellant/Cross-Respondent.
Michael A. Garvin, Erin K. McGowan, 1200 Market St., City Hall Room 314, St. Louis, MO 63103, For Respondent City of St. Louis.
Matthew M. Moak, 1200 Market St., City Hall Room 314, St. Louis, MO 63103, For Respondent Board of Building Appeals.
Kenneth C. Brostron, Brian J. Malone, 714 Locust St., St. Louis, MO 63101, For Respondent City of St. Louis Public Library.
Margaret A. Hesse, 34 N. Meramec Ave. Ste. 600, St. Louis, MO 63105, For Respondent/Cross-Appellant.
Elkin L. Kistner, Sean M. Elam, 101 S. Hanley Rd. Ste. 101, Clayton, MO 63105, For Respondents.
*669 OPINION
Colleen Dolan, J.
New Life Evangelistic Center ("New Life") appeals the judgment of the Circuit Court of the City of St. Louis affirming the decision of the Board of Building Appeals of the City of St. Louis (the "BBA") that affirmed the denial of New Life's request for an exemption to the plat-and-petition requirement that must be fulfilled in order to obtain a permit and license to operate a homeless shelter in the City of St. Louis (the "City"), pursuant to St. Louis City Code Chapter 25.32.510.[1] New Life raises five points on appeal.[2] In its first point, New Life argues that the BBA erred in affirming the underlying decision that New Life must satisfy the plat-and-petition requirement. New Life specifically argues that the requirement does not apply to it because New Life is a "church" seeking an occupancy permit for its homeless shelter and the plat-and-petition requirement only applies to "hotels, dormitories, rooming houses or boarding houses seeking a license." In its second point, New Life asserts that the BBA erred in affirming the underlying decision because City Code Chapter 25.32.510, § 903.1 is unconstitutionally vague and ambiguous as applied by the BBA.[3] In its third point, New Life contends that the BBA erred in affirming the underlying decision because its findings of fact and conclusions of law were unsupported by competent and substantial evidence. In its fourth point, New Life argues that the BBA erred in affirming the underlying decision because the plat-and-petition requirement contained in § 903.1 unconstitutionally delegates the City's legislative authority in violation of the Fourteenth Amendment's due process clause. And in its fifth point, New Life asserts that the BBA erred in affirming the underlying decision because the plat-and-petition requirement of § 903.1 violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA").[4] Specifically, New Life argues that the plat-and-petition requirement substantially burdens New Life's religious exercise, that the City failed to demonstrate the requirement served a compelling government interest, and that the City failed to show the requirement was the least restrictive means of furthering that interest. Additionally, Confluence Academy, Inc. ("Confluence Academy") cross-appeals the circuit court's judgment affirming the BBA's order, offering four points on appeal arguing that the BBA erred in granting New Life's request for an exemption to the school spacing requirement of § 903.1.
We affirm in part and reverse and remand in part.
I. Factual and Procedural Background
Revocation of New Life's 1976 Hotel Permit
New Life owns the building located at 1411 Locust Street in downtown St. Louis, *670 Missouri, and has used that building for religious practices since 1976. In addition to using the building for church services, New Life utilizes the building as a shelter for the homeless (the "Shelter"); New Life also offers other resources to the local homeless population, including assistance with transportation, groceries, medical prescriptions, clothing, and case management. New Life claims it has offered shelter to the homeless at 1411 Locust Street in various fashions since 1976, but, pertinent to this case, was issued a "hotel permit" with a 32-occupant limit by the City in March of 1976. The hotel permit for the Shelter was grandfathered into subsequent ordinances and zoning plans enacted by the City, and New Life operated the Shelter under that permit until May 12, 2015, when its permit was revoked by the City's Board of Public Service.
The Board of Public Service revoked New Life's permit for the Shelter after a majority of property owners and occupants filed a petition to have the permit revoked, alleging that the Shelter had become a detriment to the neighborhood because, instead of complying with the 32-occupant limit of the Shelter's permit, New Life was regularly accepting approximately 300 occupants every night. The petitioners went on to assert that New Life would require its homeless guests to leave the Shelter by 7 a.m. every morning; many of the Shelter's homeless guests would stay in the immediate neighborhood so that they might again be admitted into the Shelter that night. After hearing extensive testimony and reviewing voluminous documentary evidence, the Board of Public Service concluded that the Shelter had become a detriment to the surrounding neighborhood. In support of its decision to revoke the permit, the Board of Public Service cited numerous factors, including: a high concentration of homeless guests from the Shelter loitering in the immediate vicinity during the day after being ejected by New Life; common, almost daily, instances of public drunkenness and drug use by New Life guests after they were released into the neighborhood; frequent public urination, drug transactions, fighting, and public sex acts occurring inside and around the Shelter; the Shelter's geographic location was proximate to a school, Confluence Academy, and the City of St. Louis Municipal Library (the "Library"); and New Life was unwilling to cooperate with police officers' and the neighborhood's efforts to improve conditions around the Shelter. New Life did not seek judicial review of the decision by the Board of Public Service pursuant to Missouri statute § 536.110[5] ; instead, New Life attempted to challenge the decision in federal court in New Life Evangelistic Ctr., Inc. v. City of St. Louis, 2015 WL 6509338 (E.D. Mo. Oct. 27, 2015). The federal district court dismissed New Life's claims without prejudice, finding that its federal claims were not ripe for adjudication (as New Life could either appeal the Board of Public Service's order to the BBA or file an application for a new permit that would allow the Shelter to admit more occupants) and it declined to exercise jurisdiction over New Life's state law claims. Id. at *7.
New Life's Application for a Permit and License to Operate a Homeless Shelter
Rather than appeal the Board of Public Service's decision, New Life filed an application for a new permit and license on July 29, 2015, which would allow it to operate a homeless shelter able to house up to 325 occupants. Under § 903.1, which was not *671 in effect when New Life was granted its 1976 permit, the operation of "a hotel, dormitory, rooming house or boarding house without first obtaining a permit and license" is unlawful; City Code Chapter 25.32.510, § 901.2 specially clarifies that "[s]helters for the homeless ... shall be subject to all conditions of this Chapter." Additionally, § 903.1 further states that:
An applicant for a license to operate a dormitory, rooming house, boarding house or hotel, together with all other requirements of this Chapter, shall also file a plat or drawing showing its location or premises together with the position of the building to be used thereon and a written petition in favor of the issuance of such license signed by a majority of the persons, if any, occupying the premises or conducting any business on the main floor within the prescribed petition circle drawn by a radius of five hundred (500) feet plus one-half (½) of the width of the front of the premises, from the center of such premises projected to the streets....
This requisite that the applicant file a plat of the premises and a petition of the surrounding persons occupying or conducting a business is generally called the "plat-and-petition requirement." Section 903.1 also generally prohibits the approval of such an application if a church, elementary school, or secondary school is located within the aforementioned radius; this is commonly referred to as the "school spacing requirement."
Upon filing its application for its new homeless shelter permit and license, New Life did not submit a written petition with the signatures of a majority of the surrounding occupants and business proprietors. New Life claims that it was seeking, and only required, an "occupancy permit," rather than a "license," and thus did not have to comply with the plat-and-petition or school spacing requirements. After being notified that it would be required to comply with both requirements, New Life sought exemptions from the City building commissioner, who may discretionarily grant exemptions to City Code requirements pursuant to City Code Chapter 25.32.020, §§ 104.1 and 105.2 when a "special individual reason makes the strict letter of this code impractical...." The reviewing building commissioner was familiar with the reasons why the Board of Public Service revoked New Life's 1976 hotel permit. He determined New Life had not effectively implemented changes since the revocation that mitigated the Shelter's detrimental effects on the neighborhood, yet New Life's new application sought to increase the number of beds ten-fold, from 32 to 325. The building commissioner denied New Life's request for exemptions from both the plat-and-petition and the school-spacing requirements. The denial was then affirmed by the Board of Public Service, and New Life appealed to the BBA.
New Life's Appeal Before the BBA
On appeal before the BBA, New Life argued that it should not be required to comply with the plat-and-petition and school spacing requirements because it was a church and because it was seeking, and only needed, an occupancy permit to operate the Shelter. New Life also asserted that, according to a 1997 letter it had received from the City's chief deputy license collector, it did not require a "business license" to operate the Shelter; that letter stated that New Life was granted an exemption from the business license requirement because of its "status as a charitable and/or religious institution." New Life further argued that, even if it was required to comply with the plat-and-petition and school spacing requirements, it should be exempt from those requirements *672 because it had operated the Shelter at that same location for many years before § 903.1 was enacted and before Confluence Academy had located its school across the street. During the appeal's pendency, several parties appeared in opposition to New Life being granted exemptions to the plat-and-petition and school spacing requirements, including the Library (which is a political subdivision of the State of Missouri; the Library is located one block away from the Shelter), Confluence Academy (a school located directly across the street from the Shelter), and several parties that own or occupy properties within the 500-foot petition circle radius (the "Neighbor Group"). Abundant evidence was presented to the BBA by New Life and the opposing parties; the building commissioner also testified regarding New Life's application and his reasoning for denying its request for exemptions to the plat-and-petition and school spacing requirements.
Relevant to the issues on appeal in this case, the evidence presented by New Life largely consisted of testimony by New Life management and employees attesting to New Life's religious mission to serve the homeless and regarding the Shelter's operation since 1976. The BBA found that much of this testimony was irrelevant to the issue of whether the Shelter continued to be a detriment to the surrounding neighborhood. In response to questions about the potential detriment that the Shelter posed to the surrounding neighborhood because of the large number of homeless persons released from the Shelter each morning, New Life's witnesses generally stated that they did not think the homeless population created problems, with one stating, "it's not our problem." New Life also presented testimony that it had implemented changes to its policies that solved the littering and loitering issues caused by the Shelter's guests, but the BBA found that testimony was "not credible."
Evidence presented by the Neighbor Group, Confluence Academy, and the Library directly contradicted much of the evidence presented by New Life. Specifically, records from the City's public safety agencies supported that there was a link between New Life and criminal activities in the neighborhood; these records included statistics on police reports for crimes allegedly committed by New Life residents who were arrested and housed in the City's Division of Corrections that listed New Life as their "home address." Additionally, extensive testimony was presented by the Neighbor Group, Confluence Academy, and the Library supporting that the Shelter's practices were detrimental to the neighborhood. Testimony presented by the Neighbor Group included that there are daily and nightly disturbances in and around the Shelter, that many New Life guests harass those who work or visit the neighborhood, that neighbors and employees of nearby businesses do not feel safe walking to their cars, that drug usage, drug deals, and public drunkenness are common in the areas around the Shelter, and personal observations of violent and destructive activities by homeless persons identified as New Life guests. Confluence Academy employees also provided testimony detailing the Shelter's effect on the school and its students; this included how Confluence Academy employees find homeless persons sleeping on school property in the mornings, how human waste and debris must be cleaned from Confluence Academy's exterior before students arrive for school, how students can and have witnessed criminal activity because of the Shelter's proximity to the school, and how a homeless person identified as a New Life guest got into a verbal confrontation with one of the students. The Library also *673 provided testimony describing how the Shelter and the accompanying homeless population have affected its operation. Specifically, Library employees stated that many of New Life's homeless guests use the Library as a shelter during the day when New Life requires them to leave, cause disruptions in the Library by fighting and screaming, and leave large messes in the restrooms after bathing and doing laundry in the bathroom sinks. The Library staff also stated that it finds human feces, needles, and drug paraphernalia on its grounds "virtually every day," and that the number of persons accessing the Library for reference services has dropped because of homeless persons identified as New Life guests creating disturbances. In addition to the above-mentioned testimony, the Neighbor Group, Confluence Academy, and the Library all presented testimony detailing New Life's refusal to cooperate with its neighbors or with police officers in efforts to improve conditions in the neighborhood.
The BBA's Decision
Having reviewed the substantial amount of evidence before it, the BBA affirmed the Board of Public Service order approving the building commissioner's denial of New Life's request for an exemption to the plat-and-petition requirement, but it reversed the denial of and granted New Life's request for an exemption to the school spacing requirement. Before addressing the exemptions, the BBA reasoned that New Life was required to comply with § 903.1 because (a) § 901.2 specially states that "[s]helters for the homeless ... shall be subject to all conditions of this Chapter," and (b) New Life was required to obtain a "permit" to operate the Shelter because the terms "permit" and "license" are synonymous as applied within the City Code. The BBA then briefly explained that it overruled the denial of and granted New Life's request for an exemption to the school spacing requirement, stating:
This was a difficult decision given the significant negative impact of the [S]helter on Confluence Academy, but the [BBA] determines that the Plat & Petition process may serve to protect the school's interests in this particular case and could lead to productive operational changes by [New Life]. Absent the existence of an enforceable Plat & Petition process, the [BBA]'s determination regarding the school-spacing requirement would be different.
However, the BBA reasoned that the building commissioner correctly denied New Life's request for an exemption to the plat-and-petition requirement because there was sufficient evidence to support that the Shelter would continue to be a detriment to the neighborhood if New Life was allowed to operate the Shelter with a 325-occupant limit as it requested. Considering the Board of Public Service's revocation of the Shelter's previous permit, the building commissioner had requested that New Life present evidence that it had implemented changes addressing the problems that were present when New Life's previous hotel permit was revoked. New Life presented evidence indicating that it made changes to its policies for guests both inside and for the area immediately outside the Shelter, installed cameras outside the building, hired a case manager, slightly altered morning "release times," and made efforts to clean the streets and sidewalks around the Shelter. Both the building commissioner and BBA found that these changes were ineffective to solve the problems created by the Shelter and its large number of guests.
Additionally, in support of its decision to affirm and approve the denial of New Life's request for an exemption to the plat-and-petition *674 requirement, the BBA noted that New Life would not compromise on the 325-occupant limit. The BBA also stated that, even if the City did set a limit for the Shelter, New Life's historic disregard for the previous limit supported that it would not comply even with a 325-occupant limit. When testifying, New Life's own vice president was non-committal on whether New Life would obey that limit if it was granted, stating that New Life would not turn away someone if they needed shelter. The BBA continued to address New Life's points on appeal, concluding that it was clear New Life must comply with all requirements of City Code Chapter 25.32.510 and that the building commissioner's denial of New Life's request for an exemption to the plat-and-petition requirement was not arbitrary, capricious, or without rational basis and that the denial was appropriate under the circumstances.
Unlike in 2015, where New Life did not appeal the Board of Public Service's order revoking New Life's previous hotel permit, New Life sought judicial review of the BBA's decision pursuant to § 536.110. After New Life filed a petition for judicial review in the Circuit Court of the City of St. Louis, the Neighbor Group, Confluence Academy, and the Library each filed motions to intervene, which were granted by the court. Upon review of the administrative record and the BBA's decision, the court determined that the plat-and-petition requirement applied to New Life, that § 903.1 was not unconstitutionally vague and ambiguous, that the record contained substantial evidence upon which the BBA could base its ruling, that the ordinance did not unconstitutionally delegate legislative authority in violation of the Fourteenth Amendment, and that the ordinance did not place a substantial burden on New Life under RLUIPA. This appeal follows.
II. Jurisdiction
New Life challenges the constitutionality of § 903.1 in several of its points on appeal. Although this Court's jurisdiction is not raised by any party, we have a duty to examine whether we have jurisdiction sua sponte. Bennett v. St. Louis Cty., Missouri, 542 S.W.3d 392, 396 (Mo. App. E.D. 2017). If our Court lacks jurisdiction, we may not hear the appeal and must dismiss. Id.
Article V, § 3 of the Missouri Constitution provides the Supreme Court of Missouri with exclusive appellate jurisdiction in cases involving the validity of a state statute or a provision of our state's constitution. However, the Supreme Court of Missouri has held that it does not have exclusive appellate jurisdiction over claims challenging the constitutionality of municipal ordinances. Alumax Foils, Inc. v. City of St. Louis, 939 S.W.2d 907, 912 (Mo. banc 1997). "Under our constitutional scheme, ... the court of appeals has the jurisdiction initially to consider such issues on appeal." Id. We therefore have jurisdiction to determine the validity and constitutionality of the City Code sections at issue in this case. See Neuner v. City of St. Louis, 536 S.W.3d 750, 758 (Mo. App. E.D. 2017).
III. Discussion
We begin by noting that this is not an appeal of the revocation of New Life's hotel permit to operate the Shelter; rather, it is an appeal of the circuit court's judgment affirming the BBA's decision to affirm the denial of New Life's request for an exemption to the plat-and-petition requirement of § 903.1. As such, our analysis is limited primarily to the requirements set by City Code sections that New Life had to fulfill in order to obtain a new permit and license to operate the Shelter. Because New Life appeals under many different theories, we will discuss each individually.
*675 However, we will address those points challenging the constitutionality and lawfulness of the plat-and-petition requirement of § 903.1 (Points II, IV, and V) first, then analyze those points arguing misapplication of § 903.1 and insufficiency of evidence (Points I and III).[6] Subsequently, we will address Confluence Academy's cross-appeal.
Constitutionality and Lawfulness of § 903.1
Standard of Review- Points II, IV, and V
An ordinance's constitutional and statutory validity are questions of law that we review de novo. Coop. Home Care, Inc. v. City of St. Louis, 514 S.W.3d 571, 578 (Mo. banc 2017) ; Neuner, 536 S.W.3d at 758 ; City of St. Peters v. Roeder, 466 S.W.3d 538, 543 (Mo. banc 2015) ("When the ordinance conflicts with a statute, the ordinance is void."). Ordinances are presumed to be valid and lawful. Bennett, 542 S.W.3d at 397. "The party challenging the validity of the ordinance carries the burden of proving the municipality exceeded its constitutional or statutory authority." Coop. Home Care, 514 S.W.3d at 578.
Point II
In New Life's second point on appeal, it argues that the BBA erred in affirming the underlying denial of New Life's request for an exemption to the plat-and-petition requirement because § 903.1 is unconstitutionally vague and ambiguous as applied by the BBA. Specifically, New Life argues that the ordinance is vague and ambiguous as to whether the plat-and-petition requirement applies to New Life, a church, applying for an occupancy permit to operate a homeless shelter.
"The vagueness doctrine protects against the arbitrary and discriminatory application of laws." Bd. of Managers of Parkway Towers Condo. Ass'n, Inc. v. Carcopa, 403 S.W.3d 590, 592 (Mo. banc 2013). "Due process requires that laws provide notice to the ordinary person of what is prohibited.... If the terms or words used in the ordinance are of common usage and are understandable by persons of ordinary intelligence, they satisfy the constitutional requirement as to definiteness and certainty." City of Cape Girardeau v. Kuntze, 507 S.W.3d 89, 93 (Mo. App. E.D. 2016). We will not declare an ordinance void for uncertainty if "it is susceptible to any reasonable construction that will sustain it." City of Pagedale v. Murphy, 142 S.W.3d 775, 778 (Mo. App. E.D. 2004). "In reviewing vagueness challenges, the language is to be evaluated by applying it to the facts at hand." State v. Entertainment Ventures I, Inc., 44 S.W.3d 383, 386 (Mo. banc 2001).
At issue in this case is City Code Chapter 25.32.510; that chapter, which adopted a modified version of the International Property Maintenance Code, 2009, as the City's property maintenance code, was passed by the City's legislature in 2010 as part of the City's overhaul of its building code. Several sections of City Code Chapter 25.32.510 are relevant in this case-many of which are overlooked or misinterpreted by both the BBA and New Life.
*676 We first note that New Life's argument that it is unclear whether § 903.1 applies to an applicant seeking to operate a homeless shelter is completely meritless. City Code Chapter 25.32.510, § 901.2 unequivocally states that "[s]helters for the homeless ... shall be subject to all conditions of this Chapter...."[7] Because § 903.1 is within the same chapter as City Code Chapter 25.32.510, § 901.2, it is therefore entirely unambiguous that § 903.1 applies to New Life's operation of the Shelter, and New Life is subject to the section's requirements. Thus, we need only further analyze whether the requirements contained in § 903.1 and other applicable sections clearly set forth what New Life must do to legally operate the Shelter.
City Code Chapter 25.32.510, § 903, as a whole (entitled, "Licensing"), establishes the requirements that an applicant must fulfill in order to lawfully operate a homeless shelter, hotel, or other establishment that temporarily houses large quantities of people. The parties primarily scrutinize the wording and meaning of § 903.1 in this case, which reads in its entirety:
903.1 Permit and license required. It shall be unlawful to operate a hotel, dormitory, rooming house or boarding house without first obtaining a permit and license as hereinafter set forth. An applicant for a license to operate a dormitory, rooming house, boarding house or hotel, together with all other requirements of this Chapter, shall also file a plat or drawing showing its location or premises together with the position of the building to be used thereon and a written petition in favor of the issuance of such license signed by a majority of the persons, if any, occupying the premises or conducting any business on the main floor within the prescribed petition circle drawn by a radius of five hundred (500) feet plus one-half (½) of the width of the front of the premises, from the center of such premises projected to the streets. A neighborhood consent petition shall not be required for successive renewals for the same license on the same premises immediately succeeding the original licensing. No such application shall be approved wherein a church, elementary school or secondary school is located within the radius herein above described.
From the plain language of that section, it is clear that, contrary to the BBA's interpretation, an applicant must obtain both a permit and a license-implicitly meaning the terms "permit" and "license" are distinctly different and are not synonymous. If there was any question as to whether a "permit" and a "license" were two separate terms, following subsections make it even more plain; for example, City Code Chapter 25.32.510, § 903.4.2 specifically states that "[t]he license collector is hereby prohibited from issuing a license for the operation of a rooming house, boarding house, dormitory or hotel to any person until a permit has been issued...." (emphasis added). From the phrasing of City Code Chapter 25.32.510, § 903 (specifically, that the license collector cannot issue a license until a permit is issued), we conclude that "license" as used in that section falls within the definition of "license" provided in City Code Title 8, Chapter 8.02.100: " 'license' ... whenever used in this Code, shall include licenses for all purposes authorized or required by law or ordinance...."[8] Because of the language used *677 in City Code Chapter 25.32.510, § 903, specifically the references to "licenses" and the license collector, it is evident that the section necessarily intertwines with Title 8 of the City Code (which governs "Business Taxes, Licenses and Regulations" and establishes the duties of the license collector). However, this does not affect the validity of City Code Chapter 25.32.510 or Title 8 because we find no contradiction or inconsistency.
Examining City Code Chapter 25.32.510 in its entirety, it is clear that the issuance of a "license to operate" a homeless shelter by the license collector is dependent upon the applicant (a) complying with the plat-and-petition and school spacing requirements, and (b) obtaining a "permit to operate" from the Board of Public Service. Section 903.1 clearly establishes that applicants must obtain both a permit and license. That section also necessitates that, "together with all other requirements of this Chapter," applicants for a license must file a "plat or drawing" of the proposed premises, file a written petition in favor of the issuance of the license signed by a majority of the persons occupying the premises or conducting any business on the main floor within the prescribed petition circle, and comply with the school spacing requirement. City Code Chapter 25.32.510, § 903 then goes on to set forth in its subsequent subsections the procedure to obtain a permit: (1) the applicant must file an application with the building official containing all required information (§ 903.3), which will only be "accepted" by the building official if the applicant obtains a "certificate of occupancy" (§ 903.2); (2) upon filing of the application, the proposed building must undergo an inspection by the building official, who will prepare a report and recommendation on whether the building conforms to the rules and regulations of the Building Inspection Section, Health Division, and Fire Prevention Bureau (§ 903.4); and (3) after receiving the application and the report and recommendation of the building official, the Board of Public Service will issue a "permit" if the proposed building conforms with the aforementioned rules and regulations and with the requirements of the chapter. Once an applicant has obtained a permit and has complied with the plat-and-petition and school spacing requirements, the license collector then may issue a license to operate the homeless shelter to the applicant pursuant to City Code Chapter 25.32.510, §§ 903.1 and 903.4.2. Once an applicant has obtained both a permit and a license (permit + plat-and-petition requirement + school spacing requirement), the applicant may operate the hotel, homeless shelter, etc., and is in full compliance with City Code Chapter 25.32.510, § 903.
New Life contends that, pursuant to a letter it received from the City's chief deputy license collector in 1997, it was exempt from needing a license because of its "status as a religious organization under 501(c)(3)." This assertion is fundamentally incorrect. The letter referenced by New Life does not exempt it from needing a license to operate the Shelter; it only exempted New Life from taxation under the federal Internal Revenue Code, which includes the license taxes collected by the City. See 26 U.S.C.A. § 501(c)(3). Additionally, even if the 1997 letter did exempt New Life from needing a license to operate the Shelter under its previous hotel permit, it is inapplicable now. Section 903.1-which, again, clearly applies to homeless shelters pursuant to City Code Chapter 25.32.510, § 901.2-was passed by the City's legislature more than a decade after New Life received that letter, and specifically requires that parties seeking to operate a homeless shelter must obtain both a permit and a license. New Life, or *678 any other party to this case, does not point to any provision within the City Code that specifically or generally exempts religious, charitable, or non-profit organizations such as New Life from the applicable licensing requirement of § 903.1. Nor has this Court found any such provision after independently scouring the City Code. Indeed, § 903.1 is generally consistent with Title 8 of the City Code, which requires a license and/or permit for virtually every type of business, establishment, or event located within the City's geographic boundaries. City Code Title 8, Chapter 8.08.050 even creates an analogous situation for religious, educational, or charitable organizations, as it establishes that those types of organizations are exempt from the City's entertainment license tax, but the license collector must still issue a license to the organization. Further analysis of the application of § 903.1 and other related City Code provisions is contained infra within our discussion of New Life's Point I.
Thus, City Code Chapter 25.32.510, §§ 901.2 and 903 are not unconstitutionally vague or ambiguous. Those sections understandably and coherently set forth that parties seeking to operate a homeless shelter are subject to the chapter's requirements, the process that an applicant must complete in order to obtain a permit to lawfully operate a homeless shelter, and that a license to operate a homeless shelter may not be issued by the license collector until a permit to operate has been issued by the Board of Public Service and the applicant complies with the plat-and-petition and school spacing requirements. New Life's Point II is denied.[9]
Point IV
In New Life's fourth point on appeal, it argues that the BBA erred in affirming the underlying denial of New Life's request for an exemption for the plat-and-petition requirement because § 903.1 unconstitutionally violates the due process clause of the Fourteenth Amendment. Specifically, New Life asserts that § 903.1 violates the due process clause because its plat-and-petition requirement unconstitutionally delegates legislative authority to surrounding residents and property owners.
Municipal ordinances governing the usage of property that require the consent of neighboring property owners and occupants have been both upheld and struck down by the Supreme Court of the United States; in those cases (and their progeny), the results have depended upon (a) whether the municipality may regulate the proposed use of the property under its police power; (b) the extent of the authority granted to the surrounding private citizens, and (c) whether the proposed use of the property is a potential nuisance. Thomas Cusack Co. v. City of Chicago, 242 U.S. 526, 530-31, 37 S.Ct. 190, 61 L.Ed. 472 (1917) (upholding an ordinance that generally prohibited the erection of any billboards on a designated block, but permitted the prohibition to be modified with the consent of a majority of the surrounding property owners);
*679 Eubank v. City of Richmond, 226 U.S. 137, 144-45, 33 S.Ct. 76, 57 L.Ed. 156 (1912) (striking down an ordinance granting property owners on a block the authority to establish a set-back of their choosing with consent of two-thirds of the block's property owners); State of Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 122-23, 49 S.Ct. 50, 73 L.Ed. 210 (1928) (striking down an ordinance permitting a philanthropic home for children or the elderly conditioned upon gaining consent of two-thirds of the surrounding property owners). Combined, Eubanks , Cusack , and Roberge created a distinction between neighbor consent ordinances that were constitutional and those that were not: specifically, that it is constitutional for municipalities to "prohibit a disfavored use of property but permit private citizens to waive that prohibition and consent to the use," but unconstitutional if the ordinance is not a reasonable regulation within the power of the government or delegates too much governmental authority to private citizens. Silverman v. Barry, 845 F.2d 1072, 1086-87 (D.C. Cir. 1988) (citing Eubank, 226 U.S. at 137, 33 S.Ct. 76 ; Cusack, 242 U.S. at 528, 531, 37 S.Ct. 190 ; Roberge, 278 U.S. at 116, 49 S.Ct. 50 ).
"Police power is 'the power inherent in a government to enact laws, within constitutional limits, to promote the order, safety, health, morals, and general welfare of society.' " Engelage v. City of Warrenton, 378 S.W.3d 410, 414 (Mo. App. E.D. 2012) (quoting State ex rel. Rouveyrol v. Donnelly, 365 Mo. 686, 285 S.W.2d 669, 674 (1956) ). A municipality's police power is broad, but not unlimited, and an ordinance enacted pursuant to a municipality's police power must "have a rational relationship to the health, safety, peace, comfort, and general welfare of the inhabitants of the municipality." Smith v. City of St. Louis, 409 S.W.3d 404, 425 (Mo. App. E.D. 2013).
In this case, New Life does not contest that § 903.1 is a valid exercise of the City's police powers. It is clear that City Code Chapter 25.32 was enacted pursuant to the City's police powers, as City Code Chapter 25.32.020, § 101.3 states, "This code shall be construed to secure its expressed intent, which is to ensure public health, safety and general welfare insofar as they are affected by the continued occupancy and maintenance of structures and premises." We therefore do not address this issue further, and find that § 903.1 is a valid exercise of the City's police powers.
The primary issues of New Life's Point IV are whether § 903.1 delegates too much authority to private citizens and whether New Life's operation of a homeless shelter is legislatively considered a potential nuisance or hazard to the surrounding residents and property owners. The Supreme Court of the United States in both Eubanks and Roberge invalidated ordinances that provided essentially unfettered discretion to private citizens to determine whether otherwise legal use of neighboring properties was allowed; the Court decided in both cases that conveying such discretion to private citizens was an unconstitutional delegation of legislative authority that violated the due process clause of the Fourteenth Amendment. Eubank, 226 U.S. at 143-44, 33 S.Ct. 76 ; Roberge, 278 U.S. at 121-22, 49 S.Ct. 50. The ordinance in this case is not analogous to those at issue in Eubanks and Roberge, but is quite similar to the ordinance upheld in Cusack.
The ordinance from Cusack stated that:
It shall be unlawful for any person, firm or corporation to erect or construct any billboard or signboard in any block on any public street in which one half of the buildings on both sides of the street are used exclusively for residence purposes without first obtaining the consent in *680 writing of the owners or duly authorized agents of said owners owning a majority of the frontage of the property on both sides of the street in the block in which such billboard or signboard is to be erected, constructed or located....
Cusack, 242 U.S. at 527-28, 37 S.Ct. 190. The Court reasoned in Cusack that the ordinance was not an unconstitutional delegation of legislative authority because the city had properly exercised its legislative authority in enacting the ordinance prohibiting the erection of billboards in specified areas, and the ordinance only granted the neighboring property owners, whom the ordinance was meant to protect, the ability to waive that prohibition. Id. at 530-31, 37 S.Ct. 190. The Court further drew a distinction between the ordinance in that case and the one from Eubanks , stating that "one ordinance permits two thirds of the lot owners to impose restrictions upon the other property in the block [ ( Eubanks ) ], while the other permits one half of the lot owners to remove a restriction from the other property owners [ ( Cusack ) ]." Id. (emphasis added).
Consistent with the Court's holding in Cusack , we find that the ordinance in the case at bar generally prohibits the operation of hotels, homeless shelters, etc., but allows that prohibition to be waived by surrounding occupants and property owners through the plat-and-petition requirement. Similar to the ordinance's language in Cusack, § 903.1 begins, "It shall be unlawful to operate a hotel, dormitory, rooming house or boarding house without first obtaining a permit and license as hereinafter set forth." Notably, as previously discussed supra in our discussion of New Life's Point II, applicants seeking a license must complete the plat-and-petition requirement. Like the ordinance in Cusack, § 903.1 creates a general prohibition on the operation of hotels, boarding houses, rooming houses, dormitories, and homeless shelters ("It shall be unlawful to operate...."). The plat-and-petition requirement of § 903.1 allows the surrounding private citizens, whom the ordinance was designed to protect, to waive that prohibition if the applicant successfully meets the other standardized building requirements.
New Life cites two Missouri cases, State ex rel. Daniels v. Kasten, 382 S.W.2d 714 (Mo. App. 1964) and City of St. Louis v. Russell, 116 Mo. 248, 22 S.W. 470 (1893), in support of its argument that § 903.1 unconstitutionally delegates legislative authority. However, the facts from both Daniels and Russell are distinguishable from those of the case before us. We first note that § 903.1 is distinguishable from the ordinance in Russell , which conditioned the operation of livery, boarding, or sale stables upon gaining consent from half of the property owners on the same block. Similarly, the ordinance in Daniels also conditioned the issuance of a building permit to construct a "business house" in a residential district upon gaining the consent of three-fourths of the surrounding property owners in the residential district. Section 903.1 differs from both the ordinances in Russell and Daniels because it generally prohibits the operation of hotels, homeless shelters, etc., unless the surrounding occupants and business owners (whom § 903.1 was meant to protect) waive that prohibition and the applicant meets the required administrative standards. Additionally, Russell, which was decided in 1893, predated the aforementioned cases from the Supreme Court of the United States, so it is therefore unclear whether the Court's conclusion in Russell would have been the same if it had chronologically followed those cases.
The difference between § 903.1 and the ordinances in Russell and Daniels is the *681 exact distinction that the Supreme Court of the United States drew in deciding Eubanks , Cusack , and Roberge . Specifically, § 903.1 (like the ordinance in Cusack ) makes it generally unlawful to operate a hotel, boarding house, rooming house, dormitory, or homeless shelter without first obtaining a permit and license, which includes completing the plat-and-petition requirement. While the distinction is admittedly narrow, this is different from ordinances (like those in Russell, Daniels , Eubanks , and Roberge ) that condition a property owner's proposed legal use of property upon the consent of surrounding private citizens.
The distinction between "imposing" restrictions (such as in Eubanks and Roberge ) versus "waiving" them ( Cusack ), however, is determinative of whether the ordinance unconstitutionally delegates legislative authority. Ordinances like § 903.1 and that from Cusack do not unconstitutionally delegate legislative authority because the legislature has already determined that the specified use of property is unlawful due to the use being potentially hazardous or burdensome to the surrounding area. See Cusack, 242 U.S. at 531-32, 37 S.Ct. 190 (noting the reasons for the prohibition on billboards and explaining "[t]he ordinance in the case at bar absolutely prohibits the erection of any billboards in the blocks designated, but permits this prohibition to be modified with the consent of the persons who are to be most affected by such modification"); see also Roberge, 278 U.S. at 121, 49 S.Ct. 50 (explaining that, in that case, and unlike the ordinance in Cusack , "there [was] no legislative determination that the proposed building and use would be inconsistent with public health, safety, morals or general welfare"). In this case, it is clear that the City's legislature considered hotels and other temporary housing establishments to be potential hazards or nuisances. City Code Chapter 25.32.510, § 901.3 states, "[a]ny boarding house, rooming house, dormitory or hotel which shall fail to conform to the requirements of this code or other adopted codes and is violation of any laws of the city of Saint Louis and is detrimental to the health, safety and welfare of the inhabitants of the City of Saint Louis shall be deemed a hazard." In enacting § 903.1, the City generally prohibited the operation of hotels, homeless shelters, etc., but allowed that prohibition to be waived by the surrounding private citizens, whom that prohibition was designed to protect.
Further, seemingly unlike any of the ordinances from the aforementioned cases, City Code Chapter 25.32.510 does not even delegate authority to the extent the ordinance in Cusack did. Notably, as all parties in this case agree, City Code Chapter 25.32 requires that the proposed premises meet standardized building regulations and allows the building commissioner to grant exemptions to requirements of the City Code. This is relevant because the City (1) does not forfeit complete control to surrounding property owners; (2) requires that the applicant meets administrative health and safety standards; and (3) can exempt an applicant from the plat-and-petition requirement where it deems appropriate. See Eubank, 226 U.S. at 143-144, 33 S.Ct. 76 (noting that the invalidated ordinance in that case "while conferring the power on some property holders to virtually control and dispose of the property rights of others, creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest, or even capriciously"); see also Roberge, 278 U.S. at 121-22, 49 S.Ct. 50 (noting that the invalidated ordinance in that case "purports to give the owners of less than one-half the land within 400 feet *682 of the proposed building authority-uncontrolled by any standard or rule prescribed by legislative action-to prevent the trustee from using its land for the proposed home").
In this case, the plat-and-petition requirement is not an unconstitutional delegation of legislative authority for several reasons. First and foremost, § 903.1 creates a general prohibition on the operation of hotels, boarding houses, rooming houses, dormitories, and homeless shelters that can be waived by surrounding property owners and occupants through the plat-and-petition process (if the applicant also meets the additional standardized regulations). Additionally, it is clear that the City's legislature considered the operation of hotels, homeless shelters, etc. as potential hazards or nuisances and that City Code Chapter 25.32 does not cede complete control to surrounding private citizens. Therefore, consistent with the holdings in Eubanks , Cusack , and Roberge, we find that the plat-and-petition requirement of § 903.1 does not unconstitutionally delegate legislative authority in violation of the due process clause of the Fourteenth Amendment. Point IV is denied.
Point V
In New Life's fifth point, it argues that the BBA erred in affirming the underlying denial of New Life's request for an exemption to the plat-and-petition requirement because that requirement of § 903.1 unlawfully violates RLUIPA. Specifically, New Life argues that the plat-and-petition requirement of § 903.1 substantially burdens its religious exercise of operating the Shelter, and that § 903.1 is not the least restrictive means of furthering a compelling government interest.
Section 2000cc(a)(1) of RLUIPA states that "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-- (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000cc(a)(1). While "substantial burden" is undefined within RLUIPA, § 2000cc-5(7) defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and further states that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C.A. § 2000cc-5(7).
To effectively analyze whether the plat-and-petition requirement of § 903.1 violates RLUIPA, we must determine (a) whether New Life's operation of the Shelter is "religious exercise" protected by RLUIPA; (b) if New Life's operation of the Shelter is religious exercise, whether the plat-and-petition requirement substantially burdens the exercise; and (c) if the plat-and-petition requirement substantially burdens New Life's religious exercise, whether the requirement is the least restrictive means of furthering a compelling government interest.
a. Religious exercise
New Life's officers and employees claimed throughout their testimony before the BBA that operation of the Shelter and providing other resources to the homeless population is a central part of New Life's religious mission. As the BBA accepted New Life's assertion that operation of the Shelter was "religious exercise" and does not argue otherwise, we assume arguendo *683 that New Life's operation of the Shelter is religious exercise protected under RLUIPA. This assumption is supported by previous cases that have found similar operation of a homeless shelter to be religious exercise. See Family Life Church v. City of Elgin, 561 F.Supp.2d 978, 986 (N.D. Ill. 2008) ; W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C., 862 F.Supp. 538, 544 (D.D.C. 1994).
b. Substantial burden
As previously noted, RLUIPA does not define "substantial burden," and the term has not been delineated by the Supreme Court of the United States. As a result, what constitutes a "substantial burden" on religious exercise under RLUIPA has confounded federal courts, resulting in a clear circuit split. Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 94-95 (1st Cir. 2013) (noting the different interpretations of "substantial burden" offered by circuit courts). Some federal circuits have required that the land use regulation "must place more than inconvenience on religious exercise" and the regulation must be "oppressive to a significantly great extent" to constitute a substantial burden. Int'l Church of Foursquare Gospel v. City of San Leandro, 673 F.3d 1059, 1067 (9th Cir. 2011) ; Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004) (" '[S]ubstantial burden' requires something more than an incidental effect on religious exercise."); Livingston Christian Sch. v. Genoa Charter Twp., 858 F.3d 996, 1003 (6th Cir. 2017) (reasoning that "a burden must have some degree of severity to be considered 'substantial' "). Other federal circuits have determined that land use regulations substantially burden religious exercise when it "puts substantial pressure on [the religious institution] to modify its behavior." Bethel World Outreach Ministries v. Montgomery Cty. Council, 706 F.3d 548, 556 (4th Cir. 2013). Additionally, other circuits have refused to adopt any "abstract test," and have instead identified "some relevant factors and use a functional approach to the facts of a particular case." Roman Catholic Bishop of Springfield, 724 F.3d at 95 ; see also Livingston Christian Sch., 858 F.3d at 1004-05 (identifying factors such as whether there are alternative locations, whether the institution's own actions have placed a burden on itself, whether the institution faces substantial delay, uncertainty, and expense, and whether the municipality's decision-making process was arbitrary, capricious, or discriminatory).
Regardless of what definition or standard of "substantial burden" that could be applied in this case, the plat-and-petition requirement of § 903.1, in and of itself, does not substantially burden New Life's religious exercise of operating the Shelter. New Life claims that the BBA's denial of its request for an exemption is an "absolute denial" of its permit and license application and "leaves New Life no reasonable alternative to continue its homeless ministry in furtherance of its religious beliefs." This assertion is woefully inaccurate.
First and foremost, the denial of New Life's request for an exemption to the plat-and-petition requirement actually did leave New Life with an alternative: New Life could have attempted to gather the required signatures to comply with the plat-and-petition requirement. Instead, New Life did not even attempt to do so, arguing that "it would be a 'lost cause' to try and successfully obtain signatures approving the church and shelter from the same people who had signed a petition to have New Life's hotel permit revoked to begin with." New Life's argument incorrectly presumes that opinions or perceptions of New Life and the Shelter could not change in the years since its hotel license was revoked, *684 and attempts to sidestep the plat-and-petition requirement that several other homeless shelter applicants (including New Life for a different shelter) have met and that is generally applicable to all temporary housing facilities regulated by City Code Chapter 25.32.510. Nor do we agree that the BBA's denial of New Life's request was "absolute," as New Life may still gain the required signatures or successfully request an exemption if it makes improvements to mitigate the well-documented harm the Shelter poses to the surrounding neighborhood and/or agrees to comply with a decreased occupancy limit.
We find New Life's argument that § 903.1 has substantially burdened its operation of the Shelter far-fetched, considering that it did not even try to fulfill the requirement. While the evidence is clear that some of the surrounding businesses and occupants, namely the Neighbor Group, are against New Life being granted an exemption to the plat-and-petition requirement, it is inconclusive whether New Life would be unable to obtain the required signatures. Additionally, it is unclear whether even members of the Neighbor Group, who publicly opposed New Life being granted the exemption, would refuse to sign New Life's petition if New Life reduced its proposed occupancy limit, agreed to comply with an approved limit, and/or attempted to work with the Neighbor Group and police to improve conditions in and around the Shelter.
In the context of this case, the plat-and-petition requirement of § 903.1 is not a substantial burden to New Life's religious exercise of operating the Shelter. The plat-and-petition requirement of gaining signatures from a majority of the persons occupying or operating a business in the surrounding neighborhood is not inherently burdensome on New Life; rather, the evidence supports that New Life has placed this burden on itself by failing to even attempt to comply with the plat-and-petition requirement, refusing to work with its neighbors and with police to address concerns over the conditions in the Shelter and the surrounding neighborhood, declining to apply for a permit and license with a lower occupancy limit, and failing to commit to complying with the 325-occupant limit even if it was granted. See Livingston Christian Sch., 858 F.3d at 1004, 1011-12 (explaining that RLUIPA does not provide a "free pass" to land use regulations for religious institutions, and stating "[s]everal circuits have held that, when a plaintiff has imposed a burden upon itself, the government cannot be liable for a RLUIPA substantial-burden violation"); Konikov v. Orange Cty., Fla., 410 F.3d 1317, 1323 (11th Cir. 2005) (noting that "requiring applications for variances, special permits, or other relief provisions would not offend RLUIPA's goals"); see also Village Lutheran Church v. City of Ladue, 997 S.W.2d 506, 508 (Mo. App. E.D. 1999) ("[M]unicipalities may use their regulatory powers over churches solely for the purposes of promoting health, safety, morals, or the general welfare of the community."). The operation of a homeless shelter is significantly different than using property solely as a church and thus can be subject to additional regulation because "[h]ousing the homeless affects those outside the church in a way that private prayer or religious services inside the church buildings do not." City of Woodinville v. Northshore United Church of Christ , 166 Wash. 2d 633, 644, 211 P.3d 406, 411 (2009). "By way of analogy, while healing the sick is similarly connected to worship, a church must still comply with reasonable permitting processes if it wants to operate a hospital or clinic." Id. In this case, New Life's own unreasonable refusal to even try to comply with § 903.1 has caused it to fail in demonstrating that the plat-and-petition *685 requirement has substantially burdened its religious exercise.
Because we find that New Life has failed to show that the plat-and-petition requirement of § 903.1 is a substantial burden on its religious exercise of operating the Shelter, we do not reach whether the requirement is the least restrictive means for furthering a compelling government interest. New Life's Point V is denied.
Point I: Interpretation and Application of § 903.1
In New Life's first point, it argues that the BBA erred in affirming the underlying decision that required New Life to satisfy the plat-and-petition requirement of § 903.1. Specifically, New Life contends that the plat-and-petition requirement does not apply to its operation of the Shelter because the requirement only applies to hotels, dormitories, rooming houses, or boarding houses seeking a license, and that New Life, as a church, only needed and applied for an occupancy permit.
Standard of Review- Point I
We review interpretation of a municipality ordinance de novo. City of Bellefontaine Neighbors v. Scatizzi, 302 S.W.3d 730, 732 (Mo. App. E.D. 2010). "The rules governing interpretation of a statute are employed when interpreting an ordinance." Roeder, 466 S.W.3d at 543. The main objective of statutory interpretation is to ascertain the intent of the legislature from the language used and to give effect to that intent. Finnegan v. Old Republic Title Co. of St. Louis, Inc., 246 S.W.3d 928, 930 (Mo. banc 2008) ; Spradling v. SSM Health Care St. Louis, 313 S.W.3d 683, 686 (Mo. banc 2010). "When the plain language of the statute is clear and unambiguous, we do not apply any other rule of construction." City of University City v. AT & T Wireless Services, 371 S.W.3d 14, 18 (Mo. App. E.D. 2012).
Analysis
As explained supra in our discussion of New Life's Point II, both the City and New Life greatly misinterpret the meaning and operation of § 903.1. Once again, § 903.1 states that "It shall be unlawful to operate a hotel, dormitory, rooming house or boarding house without first obtaining a permit and license as hereinafter set forth...." Section 903.1 further explains that applicants seeking a license to operate such establishments must also comply with the plat-and-petition and school spacing requirements. New Life contends that it is not required to comply with the plat-and-petition or school spacing requirement of § 903.1 because (a) that section does not explicitly mention homeless shelters and (b) New Life, as a church, does not need a "license" to operate the Shelter and was only seeking an occupancy permit, and therefore did not need to satisfy the requirements. As stated previously, neither argument is persuasive.
First, New Life seemingly examines § 903.1 in a vacuum separate from the rest of City Code Chapter 25.32.510. City Code Chapter 25.32.510, § 901.2, which almost immediately precedes § 903.1, plainly states that "[s]helters for the homeless ... shall be subject to all conditions of this Chapter...." It is therefore clear that the City's legislature intended for parties seeking to operate homeless shelters to be subject to City Code Chapter 25.32.510. Second, New Life's contention that its status as a church somehow exempts it from needing a license (and therefore complying with the plat-and-petition requirement) is likewise befuddling when analyzing the plain language of the ordinance. As noted previously, New Life fails to point out any section of City Code Chapter 25.32.510 or *686 of any other City Code chapter that specifically or generally excepts religious, charitable, or non-profit organizations from needing a license under § 903.1; nor has this Court found such a provision upon its own thorough review of the City Code. New Life also seemingly relies on a 1997 letter from the City's deputy license collector for its contention that did not require a license, but as explained supra under our discussion of New Life's Point II, that argument is unavailing because the letter was clearly referring to New Life's tax-exempt status as a religious, charitable, or non-profit organization. New Life is therefore not exempt from the plat-and-petition requirement of § 903.1 because it is a church.
Undoubtedly, New Life's confusion regarding whether it needs a license under § 903.1 is exacerbated by the City's and BBA's own concerning misinterpretation of the ordinance. For some reason, the City and BBA argue that New Life did not require a license, but still had to comply with both the plat-and-petition requirement of § 903.1 to successfully obtain its permit because "license" is synonymous with "permit" as used within the City Code. The City and BBA unexplainably interpret § 903.1 as using the terms "permit" and "license" interchangeably despite the fact that § 903.1 (titled "Permit and license required") specifically states that it shall be unlawful to operate a homeless shelter without "a permit and license " (emphasis added). Upon reading the plain language of the section, it is entirely nonsensical to reason that the terms are synonymous. Additionally, the entire structure of City Code Chapter 25.32.510, § 903 and the delineation drawn between the two terms in City Code Chapter 25.32.510, § 903.4.2 ("[t]he license collector is hereby prohibited from issuing a license for the operation of a rooming house, boarding house, dormitory or hotel to any person until a permit has been issued...." (emphasis added) ) make it abundantly clear that all applicants must obtain both a permit and license to lawfully operate a hotel, homeless shelter, etc. Effectively, the City correctly concludes that New Life is subject to the plat-and-petition requirement of § 903.1, but its reasoning for why that is so is flawed.
As more thoroughly explained supra in our discussion of New Life's Point II, it is clear that the legislature intended that applicants seeking to operate a homeless shelter must obtain both a permit and license. City Code Chapter 25.32.510, §§ 903.2, 903.3, 903.4, and 903.5 set forth the procedure to procure a permit to operate. In addition to obtaining a permit (which mainly relates to whether the proposed building complies with zoning and safety standards), applicants must also satisfy the plat-and-petition and school spacing requirements of § 903.1 before the license collector may grant the applicant a license to operate pursuant to City Code Chapter 25.32.510, § 903.4.2. Although City Code Chapter 25.32.510, § 903 does not lay out the application procedure and requirements in the simplest terms possible, its plain language establishes (a) that both a permit and license are required to lawfully operate a homeless shelter; (b) the steps to obtain a permit; and (c) that an applicant must obtain a permit and satisfy the plat-and-petition and school spacing requirements before the license collector may issue a license to operate the homeless shelter.
Thus, it is clear that the legislature intended that applicants seeking to operate a homeless shelter be subject to all requirements contained within City Code Chapter 25.32.510. This includes the plat-and-petition and school spacing requirements of § 903.1, as applicants seeking to lawfully operate a homeless shelter must obtain *687 both a permit and license. New Life's Point I is denied.
Point III: Sufficiency of the Evidence
New Life argues in its third point that the BBA erred in affirming the underlying denial of New Life's request for an exemption to the plat-and-petition requirement of § 903.1 because the BBA's decision was unsupported by competent and substantial evidence. Specifically, New Life argues that the evidence before the BBA was insufficient for it to conclude that the Shelter has considerable negative effects on the surrounding neighborhood, that the evidence before the BBA did not sufficiently link any negative impact with the Shelter's presence in the neighborhood, and that New Life presented undisputed evidence that it made changes specifically intended to address and mitigate any potential harmful impact.
Standard of Review- Point III
Upon appeal of an administrative decision, we review the findings and decisions of the administrative agency, not the judgment of the circuit court. TCF, LLC v. City of St. Louis, 402 S.W.3d 176, 180 (Mo. App. E.D. 2013). The scope of judicial review for administrative rulings may extend to determining whether the decision (1) is in violation of constitutional provisions; (2) is in excess of the statutory authority or jurisdiction of the agency; (3) is unsupported by competent and substantial evidence upon the whole record; (4) is, for any other reason, unauthorized by law; (5) is made upon unlawful procedure or without a fair trial; (6) is arbitrary, capricious, or unreasonable; or (7) involves an abuse of discretion. Section 536.140.2. "A decision is unsupported by competent and substantial evidence when an appellant demonstrates the decision is contrary to the overwhelming weight of the evidence." Wright-Jones v. Missouri Ethics Comm'n , 544 S.W.3d 177, 179 (Mo. banc 2018) ; § 536.104.2. In determining whether there is sufficient competent and substantial evidence to support the agency's actions, we review the whole record, and not just evidence supporting the agency's decision. Phillips v. Schafer, 343 S.W.3d 753, 757 (Mo. App. E.D. 2011). However, we defer to the agency's ability to evaluate witness credibility. Teal v. Missouri Dep't of Soc. Servs., Family Support Div., 542 S.W.3d 417, 421 (Mo. App. E.D. 2018).
Analysis
As stated, the BBA affirmed the building commissioner's denial of New Life's request for an exemption to the plat-and-petition requirement of § 903.1. Within its administrative order, the BBA made thorough findings of fact and conclusions of law explaining its rationale in affirming the building commissioner's denial. In making its findings and conclusions, the BBA relied upon and cited numerous pieces of evidence, including: the Board of Public Service decision that revoked New Life's 1976 hotel permit because the Shelter had become a detriment to the neighborhood; extensive testimony presented by the Neighbor Group, the Library, and Confluence Academy detailing the wide range of problems still in existence since the revocation of New Life's previous permit and caused by the large homeless population that stays in the neighborhood because of the Shelter; testimony presented by the Neighbor Group, the Library, Confluence Academy, and police officers attesting to New Life's uncooperativeness in improving conditions in and around the Shelter; records from the City's public safety agencies supporting that there was a link between the Shelter and criminal activities in the neighborhood; documents presented by New Life relating to its previous 1976 hotel permit, stating solely that New Life was exempt from the City's business license *688 tax; and testimony presented by New Life attesting to its religious mission to shelter the homeless, the improvements it had made since its previous permit was revoked, and that the homeless population was not a problem for the surrounding neighborhood.
On appeal, New Life attempts to argue that every single piece of evidence supporting the BBA's denial of New Life's request for an exemption was not credible, does not sufficiently link the Shelter to bad acts of homeless persons in the neighborhood, or is inadmissible. New Life thus contends that the BBA's decision is unsupported by competent and substantial evidence because all of the supporting evidence was invalidly considered or given improper weight. Specifically, New Life asserts that the BBA should not have considered the conclusions and rationale from the previous decision rendered by the Board of Public Service, which revoked New Life's 1976 hotel permit because it found that the Shelter had become a detriment to the neighborhood when it was routinely accepting approximately 300 occupants nightly instead of its permitted 32 occupants. New Life also contends that the voluminous testimonial evidence detailing the negative effects of the Shelter on the surrounding neighborhood presented by the Neighbor Group, the Library, and Confluence Academy was insufficient or not credible to support the BBA's decision. New Life further argues that the evidence it presented, much of which consisted of testimony attesting to New Life's religious mission and that the Shelter's homeless guests were not a problem for the neighborhood, outweighed the evidence against it. All of these arguments are unpersuasive.
First, New Life's contention that the BBA incorrectly relied on the Board of Public Service decision is incorrect. New Life argues that decision, which revoked its 1976 hotel permit because the Shelter had become a detriment to the neighborhood, was irrelevant to its request in this case. However, that Board of Public Service decision is actually extremely relevant to the BBA's determination of whether it should grant New Life's request for an exemption to the plat-and-petition requirement. Notably, the Board of Public Service's decision originated with a petition of surrounding occupants and property owners alleging that the Shelter had become a detriment to the neighborhood; that petition is essentially the inverse of the plat-and-petition requirement for which New Life was seeking an exemption. Indeed, the Board of Public Service's decision is relevant to the BBA's determination because granting New Life's request would deprive surrounding neighbors of the ability to voice their input that is granted to them by § 903.1. Additionally, granting New Life's request for an exemption to the plat-and-petition requirement without considering the Board of Public Service decision would basically ignore the past problems the Shelter was found to have caused or contributed to and New Life's complete disregard of the occupancy limit set by the 1976 permit. As such, the BBA properly considered the outcome and reasoning in the previous Board of Public Service decision.
Additionally, New Life's arguments that the testimonial evidence against it was either not credible or did not sufficiently link the Shelter's guests to criminal conduct and that New Life's testimonial evidence outweighed that against it are both misplaced. Although we review the entire record, we defer to the administrative agency's ability to determine witness credibility, and we will not reweigh testimony. Vermett v. State, 544 S.W.3d 294, 298-99 (Mo. App. E.D. 2018). The BBA found that *689 much of the testimony presented by New Life was irrelevant to the issue at hand; specifically, the BBA determined that basically all of the testimony given by New Life's witnesses related to New Life's religious mission, rather than to the effect of the Shelter on the surrounding neighborhood. The BBA also found that New Life's testimonial evidence on the effects of improvements it had made since its 1976 permit was revoked was "not credible," as there was significant contradictory evidence that conditions had not improved or had possibly even worsened. Further, extensive testimonial evidence was presented in opposition to New Life being granted an exemption. As aforementioned, this included detailed descriptions of the problems caused by the homeless population once they were released by New Life each morning and statements on New Life's refusal to cooperate with its neighbors or with police. This testimony ranged from describing public drug usage and drunkenness, violence by and between homeless persons, public defecation, among others. The BBA clearly gave significant weight to the testimonial evidence presented by the Neighbor Group, the Library, and Confluence Academy, and we will not reweigh the BBA's determination of credibility. Ultimately, upon review of the whole record, we find that the voluminous testimonial evidence presented before the BBA is alone sufficient to constitute competent and substantial evidence supporting the BBA's denial. That testimony established New Life's policies, that the Shelter drew a large homeless population to the neighborhood, and that the Shelter's activities and policies placed a significant burden on the neighborhood without taking measures to effectively alleviate that burden.
Even though New Life may operate the Shelter without the intent to cause its neighbors trouble, it does so nonetheless because of how it operates. The Shelter draws hundreds of homeless persons every night, each with his or her own individual problems, concerns, and needs that are often different and more severe than those of the general population (such as mental health and substance abuse issues). While New Life's attempt to shelter as many people as it can is certainly altruistic and understandable, New Life does not allow those hundreds of people to stay at the Shelter during the day-instead forcing them back out onto the city streets each morning. As indicated by the extensive testimony before the BBA, these hundreds of people logically stay in the surrounding neighborhood because they want to be admitted back into the Shelter again the next night. The Neighbor Group, Library, and Confluence Academy also presented compelling testimony detailing how New Life's policies (specifically, the number of homeless persons it accepts and that it forces its guests out every morning) have had significant adverse effects on them individually and collectively. But rather than acknowledge and address these problems, New Life has chosen to ignore the legitimate complaints of its neighbors. To operate the Shelter as New Life does, providing hundreds of homeless persons a place to sleep, but requiring them to leave during the day, New Life inherently places an encumbrance on its neighbors. The considerable individual problems each homeless person faces combined with the sheer volume of the homeless population in the neighborhood because of the Shelter's presence predictably results in increased crime and nuisance-type behavior. As much as New Life may argue otherwise, there is plentiful evidence to support the problems that the Shelter poses for the neighborhood and New Life's unwillingness to work with neighbors and police to rectify those problems.
*690 The need for shelter and other services for the homeless population in the City cannot be overstated. However, this is not an example of a neighborhood ousting a homeless population because they are simply too much trouble. Instead, this is a case where the neighborhood rejected the detrimental practices of the Shelter itself and where New Life has failed to comply with the generally applicable requirements needed to obtain a permit and license to operate the Shelter.
Objectively, society derives a great benefit from the charitable sheltering of homeless persons by organizations like New Life. However, that considerable benefit is outweighed when such sheltering is done in a manner that is hazardous to persons both in and surrounding the shelter. Witnesses who operate other homeless shelters and work as homeless outreach workers testified before the BBA that homeless persons are more likely to commit nuisance-type crimes than the general population, that homeless persons tend to suffer a higher frequency of substance abuse than the general population, and that smaller homeless shelters are more effective than larger ones like New Life's. Additionally, police records showed that many of the Shelter's guests were also victims of crime in and around the Shelter. We believe this evidence is supportive of why a homeless shelter as large as New Life's and with New Life's policy that its occupants leave each morning imposes such a significant weight on the surrounding neighborhood. Further, from the structure of § 903.1, it is clear the City intended that the plat-and-petition process would grant surrounding citizens some say in whether a hotel or homeless shelter would be suitable for the neighborhood; in addition, as discussed supra Points II, IV, and V, the City is within its bounds to have and enforce such a requirement. New Life's assertion that it is entitled to an exemption to that requirement regardless of the evidence is incorrect.
As such, the voluminous evidence detailing New Life's policies to admit as many homeless persons as the Shelter would hold (without regard to its ability to provide services to them and supervision for those who need it), the problems caused by the large homeless population drawn to the neighborhood because of the Shelter, and New Life's lack of cooperation with its neighbors and police to improve conditions in the neighborhood constitute competent and substantial evidence supporting the BBA's denial of New Life's request for an exemption to the plat-and-petition requirement of § 903.1. New Life's Point III is denied.
Confluence Academy's Cross-Appeal
Confluence Academy offers four points in its cross-appeal of the circuit court's judgment affirming the BBA's decision to grant New Life's request for an exemption to the school spacing requirement. Specifically, Confluence Academy argues that the BBA's decision to grant the exemption was unsupported by competent and substantial evidence (Point I); was arbitrary, capricious, and unreasonable (Point II); was an abuse of discretion (Point III); and was unauthorized by law and/or in excess of the BBA's statutory authority (Point IV). Because we reverse upon finding that the BBA's decision to overturn the building commissioner's decision and grant New Life's request for an exemption to the school spacing requirement was arbitrary, capricious and unreasonable, we substantively address only that point.
Standard of Review- Confluence Academy's Cross-Appeal
Once again, our review of an administrative decision may extend to determining whether the decision (1) is in violation of *691 constitutional provisions; (2) is in excess of the statutory authority or jurisdiction of the agency; (3) is unsupported by competent and substantial evidence upon the whole record; (4) is, for any other reason, unauthorized by law; (5) is made upon unlawful procedure or without a fair trial; (6) is arbitrary, capricious or unreasonable; or (7) involves an abuse of discretion. Section 536.140.2. We review the decisions of the administrative agency, not the trial court, and examine the whole record in reviewing the agency's decisions. Coffer v. Wasson-Hunt, 281 S.W.3d 308, 310 (Mo. banc 2009).
Analysis
In its order, the BBA overturned the building commissioner's denial of New Life's request for an exemption to the school spacing requirement, and granted New Life's request. The BBA succinctly reasoned that:
This was a difficult decision given the significant negative impact of the [S]helter on Confluence Academy, but the [BBA] determines that the Plat & Petition process may serve to protect the school's interests in this particular case and could lead to productive operational changes by [New Life]. Absent the existence of an enforceable Plat & Petition process, the [BBA]'s determination regarding the school-spacing requirement would be different.
We find that granting New Life's request for an exemption to the school spacing requirement using this reasoning was arbitrary, capricious, and unreasonable under the circumstances of this case.
The building commissioner may discretionarily grant exemptions to City Code requirements pursuant to City Code Chapter 25.32.020, §§ 104.1 and 105.2 when "special individual reason makes the strict letter of this code impractical...." "Any person aggrieved by a decision of the building official may appeal said decision to the [BBA]" pursuant to City Code Chapter 25.32.020, § 110.1. While the BBA is provided authority to overturn the building commissioner's denial of a request for an exemption to the school spacing requirement, its reasoning to do so in this instance is irrationally flawed. Section 903.1 explicitly necessitates compliance with both the school spacing requirement and plat-and-petition requirement. "It is presumed that each word, clause, sentence, and section of a statute will be given meaning and that the legislature did not insert superfluous language." Macon Cty. Emergency Servs. Bd. v. Macon Cty. Comm'n , 485 S.W.3d 353, 355 (Mo. banc 2016). The BBA's brief rationale, that "the Plat & Petition process may serve to protect the school's interests in this particular case," directly contradicts the City legislature's intent in including both the plat-and-petition and school spacing requirements in § 903.1. If the legislature had intended for the plat-and-petition process to protect the interests of a nearby school or church, the school spacing requirement would not have been included in the ordinance.
Additionally, the BBA's reasoning is insufficient grounds to grant New Life's request for an exemption to the school spacing requirement where New Life seeks to operate the Shelter with a 325-occupant limit and with its current policies. The inherent negative effects of operating such a large shelter with New Life's policies has been discussed at length supra within our discussion of New Life's Point III. These detrimental effects should be given the same weight, if not more, when considering whether a request for an exemption to the school spacing requirement should be granted. The BBA mistakenly reasons that, because a majority of persons occupying or operating a business in the proximate *692 area (including Confluence Academy) must sign the petition in favor of the New Life's operation of the Shelter, Confluence Academy's interests are protected. This rationale discounts the possibility that at some point, under certain circumstances, a majority of the required persons might sign off on New Life's proposed operation of the Shelter. In that situation, Confluence Academy's interests would no longer be protected, and Confluence Academy would again be burdened by the Shelter and its policies even though a majority of its neighbors may have approved. Confluence Academy presented compelling evidence before the BBA detailing problems the Shelter has posed for the school and its students; this included descriptions of teachers and staff finding homeless persons on school property, teachers and staff having to remove debris and human excrement from the school entrance before students arrive, and even potentially dangerous interactions students have had with guests of the Shelter. These problems would likely still be present if New Life was able to gain the required signatures to operate a 325-occupant shelter. The BBA's decision to grant New Life's request for an exemption to the school spacing requirement using this rationale appears to be even more unreasonable in this case when considering that New Life allows sex offenders to stay in the Shelter (located directly across the street from Confluence Academy) for up to two weeks at a time-something the building commissioner considered in his initial denial of New Life's request for an exemption to the school spacing requirement.
In its response to Confluence Academy's cross-appeal, New Life argues that the school spacing requirement, like the plat-and-petition requirement, violates RLUIPA. But similar to our conclusion supra in our discussion of New Life's Point V, we find that the school spacing requirement does not violate RLUIPA. While New Life's operation of the Shelter may be religious exercise protected by RLUIPA, the school spacing requirement has not yet substantially burdened New Life's operation of the Shelter. Despite being initially barred from operating the Shelter across the street from Confluence Academy, New Life may still successfully obtain an exemption to the school spacing requirement or Confluence Academy may waive the requirement if New Life makes sufficient changes to its policies, occupancy limit, etc. Further, while New Life may argue that it would be difficult to find property in St. Louis that could be used as a homeless shelter and that complies with the school spacing requirement if New Life is unable to obtain a waiver or exemption, this scarcity of property is "incidental to any high-density urban land use" and "do[es] not amount to a substantial burden on religious exercise." Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003) ; see also San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1035 (9th Cir. 2004) (finding that while the ordinance at issue may have rendered the complaining college unable to provide education or worship at the proposed property, it did not substantially burden the college's religious exercise because there was no evidence in the record demonstrating that the school could not use other sites in the city). Additionally, we find it unpersuasive that New Life should not have to comply with the school spacing requirement simply because it was not required to previously. As New Life is applying for a new permit and license, it is subject to newly-enacted laws that were not in place when New Life obtained its previous permit.
We do not conclude that the building commissioner, Board of Public Service, or BBA is precluded from granting a request *693 for an exemption to the school spacing requirement, or that the requirement could not be waived by a school or church, whom the ordinance was clearly designed to protect. Rather, we find that the BBA's decision to grant New Life's request for an exemption to the school spacing requirement in this case was arbitrary, capricious, and unreasonable because, contrary to the BBA's rationale, the plat-and-petition process does not necessarily protect Confluence Academy's interests. While we reverse the BBA's decision to grant New Life's request for an exemption to the school spacing requirement because it was arbitrary, capricious, and unreasonable, we also find that the decision was unsupported by competent and substantial evidence and that it was an abuse of discretion, and could have likewise reversed on those bases. Confluence Academy's Point II on cross-appeal is granted.
IV. Conclusion
The judgment of the circuit court affirming the BBA's decision to deny New Life's request for an exemption to the plat-and-petition requirement is affirmed. We reverse the judgment of the circuit court affirming the BBA's decision to grant New Life's request for an exemption to the school spacing requirement, and the cause is remanded to the circuit court with instructions to enter judgment reversing the BBA's decision.
Kurt S. Odenwald, P.J., concur.
Gary M. Gaertner, Jr., J., concur.

All references to City Code Chapter 25.32 are to Title 25, Chapter 25.32 of the Revised Code of the City of St. Louis.

Except for New Life's points on appeal asserting constitutionality or statutory validity arguments (Points II, IV, and V), we review the decision of the BBA (an administrative agency), not the judgment of the circuit court. Zimmerman v. Mid-Am. Fin. Corp., 481 S.W.3d 564, 570 (Mo. App. E.D. 2015).

All references to § 903.1 are to Title 25, Chapter 25.32.510, § 903.1 of the Revised Code of the City of St. Louis.

All references to RLUIPA are to 42 U.S.C.A. § 2000cc.

All statutory references are to RSMo 2000 as updated through the most recent cumulative supplement, unless otherwise indicated.

Although New Life claims in its Points II and IV that the BBA erred because § 903.1 is unconstitutional, we note that administrative agencies lack the authority to decide constitutional issues. Westwood P'ship v. Gogarty, 103 S.W.3d 152, 162 (Mo. App. E.D. 2003). "If there is an issue regarding the constitutional validity of an ordinance, which the [agency] does not review, we review the decision of the circuit court on the constitutional issue, and our standard of review 'is the same as in any other court-tried case.' " WCT & D, LLC v. City of Kansas City , 476 S.W.3d 336, 340 (Mo. App. W.D. 2015).

The word "Chapter" refers to "Chapter 9: Licensed Facilities" of the International Property Maintenance Code, 2009, that is contained within City Code Chapter 25.32.510.

"This code" refers to the "Revised Code of the City" unless expressly stated otherwise. City Code Title 1, Chapter 1.08.060.

New Life also asserts in its Point II argument that the term "occupying" as used within § 903.1 is unconstitutionally vague and ambiguous; however, we do not address this contention because it was not included as part of New Life's second point on appeal, and is therefore not preserved for our review. See Manzella v. Dir. of Revenue, 363 S.W.3d 393, 395 (Mo. Ap. E.D. 2012) ("Issues that are raised only in the argument portion of the brief and are not contained in the point relied on are not preserved for appellate review."). Additionally, the argument is meritless because the term "occupying" is "of common usage and [is] understandable by persons of ordinary intelligence," and is thus not ambiguous. Kuntze, 507 S.W.3d at 93.