Ann SPRADLING, et al., Appellants,

v.

SSM HEALTH CARE ST. LOUIS, et al., Respondents.

No. SC 90613.

Supreme Court of Missouri, En Banc.

June 29, 2010.

Joan M. Lockwood, Stephen R. Woodley of Gray, Ritter & Graham PC, St. Louis, for the Spradlings.

Jeffery T. McPherson, Thomas B. Weaver, Timothy J. Gearin, Anna T. Selby of Armstrong Teasdale LLP, Kenneth W. Bean, Jaime L. Sitton of Sandberg, Phoenix & von Gontard PC, St. Louis, for health care defendants.

Stephen G. Reuter of Lashley & Baer PC, Anne Garcia of St. Louis University Medical Center, St. Louis, for Saint Louis University.

MARY R. RUSSELL, Judge.

The issue in this medical negligence case is whether the health care affidavit filed pursuant to section 538.225.2 [1] was based upon an opinion by a "legally qualified health care provider" who actively practiced "substantially the same specialty" as the defendant. This Court finds that the phrase "substantially the same specialty" used in section 538.225.2 does not require that a "legally qualified health care provider" have the same board certification as the defendant. While the legislature did not define "substantially the same specialty," one who repeatedly performs the same procedure as that allegedly performed negligently qualifies as one who actively practices "substantially the same specialty" as the defendant. The legally qualified health care provider here meets this standard. The judgment is reversed, and the case is remanded.

## I. Background

Ann and Gene Spradling filed the underlying medical negligence lawsuit against SSM Health Care St. Louis d/b/a SSM St. Mary's Health Center and SSM Medical Group, Inc. (collectively "Defendants"). Their petition alleged that Ann, who had been admitted to St. Mary's Health Center after suffering a fall, was diagnosed with compression fractures in her lower back. The next month, Ann returned to St. Mary's, where Dr. William Sprich, a neurosurgeon, performed a vertebroplasty.[2] Following the vertebroplasty, she complained of pain and paralysis in her lower extremities. When St. Mary's discharged Ann, she did not have the use of her lower extremities and was admitted to a nursing home where she continues to reside.

After filing a medical negligence lawsuit, plaintiffs are required to comply with the health care affidavit statute, section 538.225.1, which states:

In any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services, the plaintiff or the plaintiff's attorney shall file an affidavit with the court stating that he or she has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

The Spradlings' attorney filed an affidavit stating that they had obtained a written

---

1. All statutory references are to RSMo 2000 and Supp. 2009 unless otherwise noted.

2. Vertebroplasty is:

 A procedure used to relieve the pain of vertebral compression fractures. Under x-ray guidance, a needle is inserted into the affected vertebra and a bone cement [is] injected into the vertebra. Hardening of the cement stabilizes the fractured vertebra.
 6 J. E. SCHMIDT, ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER 9 (Supp. 2005).

opinion of Dr. John M. Mathis, finding that Dr. Sprich failed to use reasonable care in his treatment of Ann. The affidavit also stated that Dr. Mathis was certified in both diagnostic radiology and nuclear medicine radiology.

After the filing of the affidavit, Defendants moved to dismiss the complaint under section 538.225.6, which requires the trial court to dismiss the action without prejudice "[i]f the plaintiff or his attorney fails to file such affidavit." Defendants contended that the affidavit filed by the Spradlings' attorney failed to comply with the requirements of section 538.225.1 in that the written opinion must be of a "legally qualified health care provider." Defendants asserted that because Dr. Mathis was a radiologist, he did not practice "substantially the same specialty" as Dr. Sprich, a neurosurgeon.

The trial court dismissed the Spradlings' suit without prejudice, finding that pursuant to section 538.225.2, Dr. Mathis, a radiologist, was not a "legally qualified health care provider" because he did not actively practice "substantially the same specialty" as the defendant, a neurosurgeon.[3] The Spradlings appealed.[4] Because the Spradlings' challenge includes the validity of section 538.225, this Court has exclusive jurisdiction over the appeal. MO. CONST. art. V, sec. 3.

## II. Standard of Review

 Statutory interpretation is an issue of law that this Court reviews de novo. *S. Metro. Fire Prot. Dist. v. City of Lee's*

*Summit*, 278 S.W.3d 659, 666 (Mo. banc 2009). This Court's task in statutory interpretation is to discern the intent of the legislature from the language used. *Id.* In doing so, this Court considers the language's plain meaning. *Id.*

## III. Analysis

### A. Legally Qualified Health Care Provider

The health care affidavit statute, section 538.225, first was promulgated in 1986. At its inception, section 538.225, RSMo 1986, provided that a plaintiff filing an action against a health care provider for damages for personal injury must file a health care affidavit. The affidavit must state that the plaintiff has obtained the written opinion of a "legally qualified health care provider" that the defendant "failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use reasonable care directly caused or directly contributed to cause the damages claimed in the petition." *Id.*

This Court has recognized that the statute was a "legislative response to the public concern over the increased cost of health care and the continued integrity of that system of essential services." *Mahoney*, 807 S.W.2d at 507. *Mahoney* instructed that the legislature intended section 538.225 to dismiss medical negligence lawsuits that lack "even color of merit" and "to protect the public and litigants from the cost of ungrounded medical malpractice claims." *Id.*

---

3. Section 538.225.6 governs when the alleged error is a faulty affidavit. Another provision, section 538.225.7, which was not invoked by Defendants, governs when the alleged error is the expert's written opinion. Here, the Defendants alleged under section 538.225.6 that the affidavit was faulty in that Dr. Mathis was not a "legally qualified health care provider."

4. Defendants' motion to dismiss the appeal is denied because the points relied on comply with Rule 84.04. Further, a dismissal without prejudice for failure to comply with section 538.225 is an appealable judgment. *See Mahoney v. Doerhoff Surgical Servs., Inc.*, 807 S.W.2d 503, 506 (Mo. banc 1991).

Although section 538.225, RSMo 1986, did not define "legally qualified health care provider,"[5] in 2005, the legislature passed House Bill 393, which did include a definition:

As used in this section, the term "legally qualified health care provider" shall mean a health care provider licensed in this state or any other state in the same profession as the defendant and either actively practicing or within five years of retirement from actively practicing substantially the same specialty as the defendant.

Section 538.225.2.

The issue presented by this case is whether the trial court correctly interpreted section 538.225.2 in dismissing the action because Dr. Mathis was not a "legally qualified health care provider" as defined by the statute. This issue requires the resolution of two questions. First, this Court must determine whether the phrase "substantially the same specialty" applies to those health care providers actively practicing and those who are retired. Second, because the legislature did not define "substantially the same specialty," this Court must ascertain the meaning of the phrase.

## B. Actively Practicing v. Retired

In interpreting section 538.225.2, the first question posed is which phrase or phrases "substantially the same specialty" modifies. The Spradlings contend that "substantially the same specialty" modifies "within five years of retirement from actively practicing," so that the health care provider only must have practiced substantially the same specialty as the defendant if he or she is retired. Defendants claim, however, that it also modifies "actively practicing," so that whether the health care provider actively practices or is retired, he or she must have "substantially the same specialty" as the defendant.

This Court was faced with another situation involving the applicability of a modifier in *Norberg v. Montgomery*, 351 Mo. 180, 173 S.W.2d 387 (1943). At issue in *Norberg* was the following statutory language:

Wherever in this act the term "accounting officer" shall appear, it shall be deemed to mean the county clerk, county comptroller, county auditor, accountant or other officer or employee keeping the principal records of the county.

Section 10934, RSMo 1939.

The parties' dispute in *Norberg* centered on which words "keeping the principal records of the county" modified: "other officer or employee" or all of the positions named. *Norberg*, 173 S.W.2d at 389. This Court took a two-step approach in its interpretation of the statute. *Id.* at 389, 390. First, it considered all sections of the county budget law and harmonized them to give effect to the legislature's intent. *Id.* at 389. From its review of the county budget law, this Court determined that the legislature's intent was that "keeping the principal records of the county" modified all the positions named. *Id.* at 390. It found that the "accounting officer" must "keep the principal records of the county," but depending on the county, that person

---

5. In *Fields v. Curators of the University of Missouri*, 848 S.W.2d 589 (Mo.App.1993), the court gave a definition of "legally qualified health care provider." As noted by the court, "health care provider" was defined under section 538.205(4), RSMo 1986. *Id.* at 590. The court's task was to determine the effect of the modifier "legally qualified." The court found that "legally qualified" meant that the health care provider must meet the requirements for an expert witness. *Id.* In other words, the witness must have "acquired, by technical training and practical experience, special knowledge not shared by men in general," so that the witness may testify as to the proper standard of care. *Id.*

may be the county clerk, county comptroller, county auditor, accountant, or other officer or employee. *Id.*

■■■ Next the Court determined that the grammatical construction of the statute supported its interpretation. *Id.* Under the last antecedent rule, relative and qualitative words are to be applied only to the words or phrases preceding them. *Id.* The relative and qualitative words "are not to be construed as extending to or including others more remote." *Id.* In reaching its holding that the phrase "keeping the principal records of the county" modified all of the officers named, the Court found that the last antecedent rule is not always mandatory in statutory interpretation. *Id.* It is "merely an aid to construction and will not be adhered to where extension to a more remote antecedent is clearly required by consideration of the entire act." *Id.* "Where several words are followed by a clause as much applicable to the first and other words as to the last, the clause should be read as applicable to all." *Id.*

■■ In applying this two-step approach here, the legislative intent first must be discerned. The intent of the legislature in passing House Bill 393 was to strengthen the requirements for filing a medical malpractice action. House Bill 393 was yet another "legislative response to the public concern over the increased cost of health care and the continued integrity of that system of essential services." *See Mahoney,* 807 S.W.2d at 507. The effect of the revisions to section 538.225, including the adoption of a definition for "legally qualified health care provider," was to dismiss medical negligence lawsuits that "lack even color of merit" at an early stage of litigation. *See id.* While the legislature intended to protect medical professionals from baseless lawsuits, it also intended to protect the public from rising health care costs as a result of baseless lawsuits. *See id.*

To adopt the Spradlings' proposed interpretation of the statute would not meet the legislature's purpose. If this Court were to adopt the Spradlings' proposed interpretation, only those health care providers within five years of retirement would have had to practice "substantially the same specialty" as the defendant. That interpretation would not follow the legislature's intent. To honor that intent, "substantially the same specialty" must modify "actively practicing" as well as "within five years of retirement from actively practicing."

The grammatical construction of section 538.225 supports this interpretation. Using the last antecedent rule, the Spradlings' proposed interpretation would not be correct because "substantially the same specialty" would modify only "within five years of retirement from actively practicing." It would not extend to modify "actively practicing." Considering the legislature's intent in passing House Bill 393 and the grammatical construction of the statute, "substantially the same specialty" is as applicable to "actively practicing" as it is to "within five years of retirement from actively practicing." The trial court did not err in its interpretation that "substantially the same specialty" applies to actively practicing health care providers, such as Dr. Mathis.

## C. "Substantially the Same Specialty"

■■■ The next issue in interpreting section 538.225.2 is determining the meaning of "substantially the same specialty." The legislature did not provide statutory guidance, so this Court's task is to determine what the legislature intended from the plain meaning of the phrase. If the legislature does not expressly define statutory language, it is given its plain and ordinary meaning, as typically found in the

dictionary. *Derousse v. State Farm Mut. Auto. Ins. Co.*, 298 S.W.3d 891, 895 (Mo. banc 2009). "Specialty" is defined as "an aptitude or special skill in a particular endeavor." Webster's Third New International Dictionary Unabridged 2186 (1993).

The legislature chose to modify "specialty" with the phrase "substantially the same." " 'Substantially,' as the word is used in the statute, is synonymous with 'practically', 'nearly', 'almost', 'essentially' and 'virtually.' " *Lane v. Lensmeyer*, 158 S.W.3d 218, 227 (Mo. banc 2005). By using that phrase, the legislature recognized that there may be situations in which the health care provider who gives an opinion as to the standard of care may not have the *exact* board certification as the defendant.[6] Instead, the health care provider may have a different board certification but may practice "substantially the same specialty" because of an expertise in the medical procedure at issue.[7] Many medical procedures are not peculiar to one board certification. *See, e.g.*, John I. Brewer, *Good Fences Make Good Neighbors: The Scope of Medical Specialties*, 16 Obstetrics & Gynecology 235 (1960) (explaining how other specialties overlap with obstetrics and gynecology).

■ To rebut the Defendants' motion to dismiss, the Spradlings filed an affidavit by Dr. Mathis, which included his curriculum vitae. During the course of his career, Dr. Mathis has performed or assisted in more than 3,000 vertebroplasties and remains in the active practice of medicine, including performing vertebroplasties.[8] He also has served in several leadership roles for the American Society of Spine Radiology and the American Society of Neuroradiology. In the span of 15 years, he has given more than 50 lectures and 15 scientific presentations about vertebroplasty. Dr. Mathis has written at least 15 book chapters as well as at least 20 peer-reviewed scientific publications concerning vertebroplasty. He co-authored the first book about vertebroplasty, which first was printed in 2002. Additionally, from 2000 to 2007, he served as a medical consultant for education for a bone cement company. As a part of that position, Dr. Mathis taught physicians, including neurosurgeons, how to perform vertebroplasties.

While Dr. Mathis is a radiologist rather than a neurosurgeon, his experience establishes that he was actively practicing "substantially the same specialty" as the defendant in that he has sufficient experience in performing vertebroplasties. Dr. Mathis is not board certified in the same field of medicine as Dr. Sprich.[9] But under Webster's dictionary definition of "specialty," Dr. Mathis has "an aptitude or special skill" in performing vertebroplasties, as

---

6. In fact, a health care professional may have no board certification at all. While the majority of physicians choose to become board certified, it is an optional, voluntary process. John J. Smith, *Legal Implications of Specialty Board Certification*, J. Legal Med., Mar. 1996, at 73–74. However, many hospitals and managed care organizations require board certification. *See id.* at 74.

7. "Specialty boards generally discount the impact of certification on physicians and medical practice." Smith, note 6, at 77. "They ... emphasize that certification is not necessary for a physician to practice a specialty." *Id.* at 78.

8. Dr. Mathis likely would be qualified to be an expert at trial. *See* section 490.065.1 ("In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.").

9. Dr. Mathis was certified by the American Board of Radiology in diagnostic radiology and nuclear medicine radiology.

evidenced by his performance of or assistance in over 3,000 vertebroplasties. In addition, his publications, lectures, and seminars exhibit his academic interest and expertise in vertebroplasties.

Dr. Mathis is the type of "legally qualified health care provider" as intended by the legislature when it used the phrase "substantially the same specialty." By enacting section 538.225, the legislature sought to prevent plaintiffs from relying on opinions from health care providers with minimal to no experience in performing the procedure in question. The Spradlings' reliance on Dr. Mathis' opinion was the type of reliance the legislature sought to authorize. The trial court's dismissal of the action was error.

## IV. Conclusion

The judgment is reversed, and the case is remanded.[10]

All concur.

---

**10.** The Spradlings raised numerous constitutional issues in their brief. However, they need not be addressed as this case can be resolved by statutory interpretation. *See State ex rel. Brown v. Shaw*, 129 S.W.3d 372, 373 (Mo. banc 2004).