

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| S.M.H., | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | **WD83050** |
| | ) | |
| ERIC SCHMITT, ATTORNEY | ) | **FILED: June 16, 2020** |
| GENERAL OF THE STATE OF | ) | |
| MISSOURI, and SARAH STEELMAN, | ) | |
| COMMISSIONER OF | ) | |
| ADMINISTRATION, STATE OF | ) | |
| MISSOURI, | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Cole County**
**The Honorable Patricia Joyce, Judge**

**Before Division Two: Mark D. Pfeiffer, P.J.,**
**and Alok Ahuja and Gary D. Witt, JJ.**

While Respondent S.M.H. was a student in a high school in the St. Louis Public School District, she was sexually molested by one of her teachers. During the period when the abuse was occurring, the school district lost its state accreditation. As a result, the Special Administrative Board of the Transitional School District of the City of St. Louis, established by § 162.1100,[1] became the district's governing body, and the employer of S.M.H.'s abuser.

S.M.H. obtained a default judgment for $4 million against the teacher who had abused her. She then filed a declaratory judgment action in the Circuit Court of Cole County against Attorney General Eric Schmitt and Commissioner of

---

[1] Unless otherwise indicated, statutory citations refer to the 2016 edition of Revised Statutes of Missouri, updated through the 2019 Cumulative Supplement.

Administration Sarah Steelman (collectively "the State"). In her declaratory judgment action, S.M.H. contended that she was entitled to payment on the judgment from the State Legal Expense Fund established by § 105.711.

The circuit court granted summary judgment to S.M.H. The State appeals. It argues that the Legal Expense Fund is not liable to satisfy S.M.H.'s judgment, because the teacher who molested her was not employed by an "agency of the state," as required by § 105.711.2(2). The State also contends that summary judgment for S.M.H. was inappropriate because of the existence of genuine issues of material fact concerning whether the accused teacher tendered the defense of S.M.H.'s claims to the State, as required by § 105.716.2.

We affirm.

## Factual Background

Between 2005 and 2009, S.M.H. attended Central Visual and Performing Arts High School in the City of St. Louis. During the same period, Allen Merry worked as a music teacher at the high school and at another school in the district. S.M.H. alleged that, beginning in 2006 and continuing for several years, Merry sexually abused her on the campus of the high school and on the campus of the other St. Louis school at which he taught. In February 2012, Merry was arrested and charged with eighteen counts related to the abuse and molestation of S.M.H. He pleaded guilty to statutory rape, sodomy, sexual contact with a student by a teacher, and sexual exploitation of a minor.

When the abuse started, the St. Louis Public School District was governed by the locally elected Board of Education of the City of St. Louis. In June 2007, the St. Louis Public School District lost its state accreditation. By operation of § 162.1100.3, the Special Administrative Board of the Transitional School District of the City of St. Louis became the district's governing body upon the district's loss of accreditation. *See Bd. of Educ. of City of St. Louis v. Mo. State Bd. of Educ.*, 271

2

S.W.3d 1, 6 (Mo. 2008) (rejecting challenge brought by locally elected Board of Education to the State's accreditation decision, and to the constitutionality of § 162.1100).

On October 13, 2015, S.M.H. filed a petition against Merry in the Circuit Court of the City of St. Louis, seeking damages for sexual and emotional abuse. (Case No. 1522-CC10821). Although Merry was personally served, he did not respond to the lawsuit. On January 11, 2018, S.M.H. filed a motion seeking a default judgment against Merry. The circuit court granted the motion for default judgment on March 6, 2018. After a hearing on the same day, the circuit court awarded S.M.H. $4 million in damages.

After obtaining the default judgment against Merry, S.M.H.'s counsel demanded satisfaction of the judgment from the Legal Expense Fund. The State refused on the basis that Merry was not an employee of an "agency of the state," and therefore was not covered by the Fund.

On April 24, 2018, S.M.H. filed a declaratory judgment action against the State in the Circuit Court of Cole County, seeking a finding that the Legal Expense Fund was required to satisfy the default judgment.

The State filed a motion to dismiss S.M.H.'s petition for failure to state a claim, in which it argued that the St. Louis Public School District was not an "agency of the state," even when it was governed by the Special Administrative Board of the Transitional School District. For her part, S.M.H. filed a motion for summary judgment, contending that the undisputed facts established that the Legal Expense Fund was required to pay the default judgment. In opposing S.M.H.'s summary judgment motion, the State repeated its argument that Merry was not an employee of an "agency of the state." It also argued that summary judgment was unwarranted because a genuine issue of material fact existed as to

3

whether Merry had tendered the defense of S.M.H.'s underlying civil action to the State.

On July 25, 2019, the circuit court denied the State's motion to dismiss and sustained S.M.H.'s motion for summary judgment. The court ordered that the Attorney General and the Commissioner of Administration authorize payment from the Legal Expense Fund for S.M.H.'s default judgment, in the amount of $4 million plus accrued interest.

The State appeals.

## Standard of Review

> Appellate review of the grant of summary judgment is essentially de novo. "The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially." This Court reviews the record in the light most favorable to the party against whom judgment was entered. "Summary judgment is appropriate when the moving party has [established], on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law."

*Newton v. Mercy Clinic E. Communities*, 596 S.W.3d 625, 628 (Mo. 2020) (citations omitted).

## Discussion

The State asserts two Points on appeal. In the first, it argues that the Legal Expense Fund does not provide coverage for S.M.H.'s default judgment against Merry, because he was not employed by an "agency of the state." In its second Point, the State argues that even if Merry was an employee of an "agency of the state," genuine issues of material fact remain regarding whether he tendered the defense of S.M.H.'s claims to the State, which is a precondition to coverage by the Fund.

## I.

The State's first Point implicates questions of statutory interpretation.

4

"Statutory interpretation is a question of law, which is subject to *de novo* review on appeal." "The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning."

*Li Lin v. Ellis*, 594 S.W.3d 238, 241-42 (Mo. 2020) (citations omitted).

## A.

"In 1983, the Missouri Legislature enacted §§ 105.711-.726, creating the State Legal Expense Fund." *State ex rel. Koster v. Kansas City Bd. of Police Comm'rs*, 532 S.W.3d 191, 194 (Mo. App. W.D. 2017) (citation omitted). The Legal Expense Fund operates as "a voluntary assumption of defense and payment of claims against State employees sued for their conduct arising out of and performed in connection with official duties on behalf of the state." *Id.* at 194-95 (citation and internal quotation marks omitted).

In this case, Legal Expense Fund coverage depends on whether Merry is considered an employee of an "agency of the state." Section 105.711.2 provides in relevant part:

> Moneys in the state legal expense fund shall be available for the payment of any claim or any amount required by any final judgment rendered by a court of competent jurisdiction against:
>
> (1) The State of Missouri, or any agency of the state . . .;
>
> (2) Any officer or employee of the State of Missouri or any agency of the state, . . . upon conduct of such officer or employee arising out of and performed in connection with his or her official duties on behalf of the state, or any agency of the state . . . .

In *Smith v. State*, 152 S.W.3d 275 (Mo. 2005), the Missouri Supreme Court held that members of the St. Louis Board of Police Commissioners, and officers of the St. Louis Police Department, were officers or employees of an "agency of the state," entitled to coverage under the Legal Expense Fund. The Court held that "[t]he statutory framework governing the St. Louis Police Board" mandated the conclusion that it was an "agency of the state," "as opposed to a local or municipal

5

agency." *Id.* at 278.  In reaching its conclusion, the Court emphasized the following features of the St. Louis Police Board:

> The members of the Board, other than the mayor of St. Louis ex-officio, are appointed by the governor with the advice and consent of the senate, and they receive their commissions from the governor.  It is also the governor who is authorized by statute to remove any commissioner for misconduct in office.  In addition, the general assembly has imposed upon the Board numerous requirements pertaining to the Board's duty to establish and employ a "permanent police force," including those that establish the qualifications of police officers, the number of police officers of each rank that the Board may employ, and the maximum amount that officers of each rank can be paid.  Further, the Board is required to make its records available for inspection by the general assembly or any committee thereof.  In all these respects, the Police Board is answerable to the state rather than the City.
>
> In fact, the general assembly has expressly prohibited the City of St. Louis and its officials from presuming to exercise authority or control over the Board or the Police Department.

*Smith*, 152 S.W.3d at 278 (statutory citations omitted).  In addition to the statutory provisions establishing the Police Board, the Court also recognized the existence of caselaw "consistently recogniz[ing]" the Police Board as a state agency in other contexts.  *Smith*, 152 S.W.3d at 278-79.  "[B]ased on a structural analysis of the statutes creating the Board and analogies to case law holding that the Board is an agency of the state in other contexts," the Supreme Court held that the St. Louis Board of Police Commissioners is an "agency of the state" subject to Legal Expense Fund coverage.  *Id.* at 279.

We recognize that the legislature overruled the specific result in the *Smith* case, and withdrew Legal Expense Fund coverage for police officers employed by the St. Louis and Kansas City Boards of Police Commissioners, when it enacted a new § 105.726.3 in 2005.  Section 105.726.3 (enacted by S.B. 420, 93rd Gen. Assembly, 1st Reg. Sess. (2005)), provides that

6

Moneys in the state legal expense fund shall not be available for the payment of any claim or any amount required by any final judgment rendered by a court of competent jurisdiction against a board of police commissioners established under chapter 84, including the commissioners, any police officer, . . . or any other individual or entity acting or purporting to act on its or their behalf. Such was the intent of the general assembly in the original enactment of sections 105.711 to 105.726, and it is made express by this section in light of the decision in *Wayman Smith, III, et al. v. State of Missouri*, 152 S.W.3d 275. Except that the commissioner of administration shall reimburse from the legal expense fund the board of police commissioners established under section 84.350, and any successor-in-interest established pursuant to section 84.344, for liability claims otherwise eligible for payment under section 105.711 paid by such board up to a maximum of one million dollars per fiscal year.

§ 105.726.3 (emphasis added); *see also State ex rel. Koster v. Kansas City Bd. of Police Comm'rs*, 532 S.W.3d 191, 196 (Mo. App. W.D. 2017); *Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1086 (8th Cir. 2006) (recognizing that "in express response to the Missouri Supreme Court's [*Smith*] decision, the Missouri General Assembly passed a law limiting the state's obligations under the SLEF to the boards of police commissioners" to a maximum of $1 million per fiscal year). The same 2005 legislation also added a sentence to § 105.726.1, rejecting *Smith*'s holding that the Legal Expense Fund statutes had the effect of waiving the State's own sovereign immunity. 152 S.W.3d at 280.

Although the General Assembly overruled the *specific result* in the *Smith* case, and *Smith*'s holding that the Legal Expense Fund statutes waive the sovereign immunity of the State, we do not believe that the legislature thereby rejected the Supreme Court's "structural analysis" of the statutes creating a particular governmental entity, or the Court's emphasis on the level of State control over a particular agency, to determine whether an entity is an "agency of the state" for purposes of Legal Expense Fund coverage. We note that at least two later cases apply *Smith*'s analytical framework in deciding whether *other* public entities constitute "agencies of the State" for purposes of the Legal Expense Fund. *See*

7

*P.L.S. ex rel. Shelton v. Koster*, 360 S.W.3d 805, 817 (Mo. App. W.D. 2011) ("We disagree with Plaintiff, however, that the state's relationship to the Board of Police Commissioners of St. Louis[, at issue in *Smith*,] is comparable to the state's relationship to its school districts."); *Pub. Sch. Retirement Sys. Of Mo. v. State Street Bank & Trust Co.*, 640 F.3d 821, 832 (8th Cir. 2011) (Missouri law; relying on *Smith* in determining whether state retirement systems would be considered "agencies of the state" for purposes of Legal Expense Fund coverage). Under Article V, § 2 of the Missouri Constitution, we are bound to follow *Smith*'s analysis "until that decision is modified or overruled by the Supreme Court" or by express legislative action. *Fay v. Stephenson*, 552 S.W.3d 753, 759 (Mo. App. W.D. 2018).

## B.

Under the "structural analysis" mandated by *Smith*, the unique nature of the Special Administrative Board which governs the St. Louis Public School District after a loss of accreditation renders the District an "agency of the state" for purposes of Legal Expense Fund coverage.

In Missouri, "[t]he powers, duties, and obligations of school districts" are established by statute. *State ex rel. Sch. Dist. of Springfield R-12 v. Wickliffe*, 650 S.W.2d 623, 625 (Mo. 1983) (citation omitted). "Missouri law creates three different types of school districts: seven-director districts, urban districts, and metropolitan districts," the latter of which is defined as "[e]very city in this state, not within a county." *Brooks v. Bd. of Educ. of Sch. Dist. of Riverview Gardens*, No. 4:10CV1043-DJS, 2010 WL 11695144, at *2 (E.D. Mo. Aug. 12, 2010) (quoting § 162.571).[2]

In normal times, the metropolitan school district established for the City of St. Louis is governed by the locally elected Board of Education of the City of St.

---

[2] At present "St. Louis City is the only member" of the class defined as "any city not within a county." *Jefferson Cty. Fire Protection Dists. Ass'n v. Blunt*, 205 S.W.3d 866, 872 n.6 (Mo. 2006), overruled on other grounds, *City of Aurora v. Spectra Communics. Grp., LLC*, 592 S.W.3d 764, 778 (Mo. 2019).

8

Louis.  § 162.571; *Bd. of Educ. of St. Louis v. Daly*, 129 S.W.3d 405, 405 (Mo. App. E.D. 2004).  The Board of Education of the City of St. Louis has "all the powers of other school districts under the laws of this state . . . and shall perform all duties required by general laws of school districts."  § 162.621.1.  This includes general and supervisory control and management of the public schools and school property, the appointment of the district's officers and employees, and the establishment of their compensation.  *Id.*

In 1998, however, the Missouri legislature modified this framework by enacting Senate Bill 781.  *Bd. of Educ. of City of St. Louis v. Mo. State Bd. of Educ.*, 271 S.W.3d 1, 5 (Mo. 2008).  S.B. 781 was enacted as part of the settlement of a "long-running federal desegregation lawsuit regarding the City of St. Louis public schools."  *Id.*; *see also Liddell v. Bd. of Educ. of City of St. Louis*, No. 4:72CV100 HEA, 2019 WL 1359290, at *1-2 (E.D. Mo. March 26, 2019).  S.B. 781 enacted a new § 162.1100, which established within the City of St. Louis "a school district to be known as the 'Transitional School District of [the City of St. Louis],'" a district "coterminous" with the boundaries of the St. Louis Public School District. § 162.1100.1.  Under § 162.1100.1, the Transitional School District (or "TSD") is a "body corporate and politic and a subdivision of the state."  The operation of the statute is limited to a "city not within a county," § 162.1100.1 – meaning that it applies <u>only</u> to the City of St. Louis.  *See* footnote 2, above.

Section 162.1100 contemplates that – initially – the Transitional School District would serve in a temporary, supportive role, as the St. Louis Public School District transitioned from federal-court control back to control by its locally elected Board of Education.  The statute provides that the TSD

> shall have the responsibility for educational programs and policies
> determined by a final judgment of a federal school desegregation case
> to be needed in providing for a transition of the educational system of
> the city from control and jurisdiction of a federal court school

9

desegregation order, decree or agreement and such other programs and policies as designated by the governing body of the school district.

§ 162.1100.1. As initially constituted, the governing board of the Transitional School District consists of "three residents of the district," one appointed by "the governing body of the district" (*i.e.*, the Board of Education of the City of St. Louis), one by the mayor of the City of St. Louis, and one by the "president of the [City's] board of alderman." § 162.1100.2(1). The locally elected Board of Education continues to govern the public schools outside of the TSD's limited statutory purpose.

S.B. 781 provides, however, for a radical restructuring of the school district's governance in the event that the district loses its accreditation from the State Board of Education. *First*, upon loss of State accreditation, the member of the Transitional School District's governing board appointed by the Board of Education of the City of St. Louis is removed. § 162.110.2(2). That member is "replaced by a chief executive officer nominated by the state board of education and appointed by the governor with the advice and consent of the senate." *Id.* The statute provides that

> [t]he chief executive officer need not be a resident of the district but shall be a person of recognized administrative ability, shall be paid in whole or in part with funds from the district, and shall have all other powers and duties of any other general superintendent of schools, including appointment of staff. The chief executive officer shall serve for a term of three years or until his successor is appointed or until the transitional district is dissolved or terminated. His salary shall be set by the state board of education.[3]

*Second*, upon the school district's loss of accreditation, all of the powers and responsibilities of the Board of Education of the City of St. Louis (except for the Board's auditing and public reporting obligations) are transferred to the Special

---

[3] The duties of a superintendent of a metropolitan school district include "general supervision, subject to policies established by the board, of the school system . . . courses of instruction, discipline and conduct of the schools, textbooks and studies." § 168.211.2. In addition, subject to the board's approval, the superintendent is responsible for "[a]ll appointments, promotions and transfers of teachers and all other employees." *Id.*

10

Administrative Board of the Transitional School District. *See* §§ 162.621.2, 162.1100.3; *see also Bd. of Educ. of City of St. Louis*, 271 S.W.3d at 16-18; *Liddell*, 2019 WL 1359290, at \*2 n.1 (proceeding to enforce the desegregation settlement; recognizing that, by virtue of §§ 162.621.2 and 162.1100, the Special Administrative Board "is the sole party with the power to enter into agreements or to pursue legal action on behalf of the St. Louis Public Schools District," and that it had been substituted in the litigation for the Board of Education of the City of St. Louis).

In addition to the transfer of the existing powers of the Board of Education of the City of St. Louis, § 162.1100.4 also expressly provides that

> [t]he special administrative board's powers and duties shall include:
>
> (1)    Creating an academic accountability plan, taking corrective action in underperforming schools, and seeking relief from state-mandated programs;
>
> (2)    Exploration of alternative forms of governance for the district;
>
> (3)    Authority to contract with nonprofit corporations to provide for the operation of schools;
>
> (4)    Oversight of facility planning, construction, improvement, repair, maintenance and rehabilitation;
>
> (5)    Authority to establish school site councils to facilitate site-based school management and to improve the responsiveness of the schools to the needs of the local geographic attendance region of the school;
>
> (6)    Authority to submit a proposal to district voters pursuant to section 162.666 regarding establishment of neighborhood schools.

*Third*, § 162.1100.5 grants the governing body of the Transitional School District special taxing powers, if those power are authorized by "[t]he provisions of a final judgment as to the state of Missouri and its officials in a school desegregation case." § 162.1100.5(1). The statute provides that these special taxing powers will not be subject to certain locally adopted tax abatements or tax increment financing,

or to the statutory provisions requiring school districts to "maintain a minimum value of operating levy." § 162.1100.5(2)(a), (2)(b), (3).

*Fourth*, § 162.1100 imposes a number of additional obligations on the Special Administrative Board for the Transitional School District, which do not apply generally to other districts. In multiple instances, the TSD's performance of these special, additional responsibilities is expressly made "subject to review and approval of the state board of education." Thus, the statute provides:

> 6. (1) The special administrative board established in this section shall develop, implement, monitor and evaluate a comprehensive school improvement plan, and such plan shall be subject to review and approval of the state board of education. The plan shall ensure that all students meet or exceed grade-level standards established by the state board of education pursuant to section 160.514;
>
> (2) The special administrative board shall establish student performance standards consistent with the standards established by the state board of education pursuant to section 160.514 for preschool through grade twelve in all skill and subject areas, subject to review and approval of the state board of education for the purpose of determining whether the standards are consistent with standards established by the state board of education pursuant to section 160.514;
>
> (3) All students in the district who do not achieve grade-level standards shall be required to attend summer school; except that the provisions of this subsection shall not apply to students receiving special education services pursuant to sections 162.670 to 162.999;
>
> (4) No student shall be promoted to a higher grade level unless that student has a reading ability at or above one grade level below the student's grade level; except that the provisions of this subsection shall not apply to students receiving special education services pursuant to sections 162.670 to 162.999;
>
> (5) The special administrative board established in this section shall develop, implement and annually update a professional development plan for teachers and other support staff, subject to review and approval of the state board of education.

7.     The school improvement plan established pursuant to this section shall ensure open enrollment and program access to all students in the district, and, consistent with the Missouri and United States Constitutions, shall give first priority to residents of the city for admission to magnet schools.  The school board shall take all practicable and constitutionally permissible steps to ensure that all magnet schools operate at full capacity.  Students who change residence within the district shall be allowed to continue to attend the school in which they were initially enrolled for the remainder of their education at grade levels served by that school, and transportation shall be provided by the district to allow such students to continue to attend such school of initial enrollment.

8.     To the extent practicable, the special administrative board shall ensure that per pupil expenditures and pupil-teacher ratios shall be the same for all schools serving students at a given grade level.

9.     The special administrative board shall ensure that early childhood education is available throughout the district.

10.     The special administrative board shall ensure that vocational education instruction is provided within the district.

11.     The special administrative board shall establish an accountability officer whose duty shall be to ensure that academically deficient schools within the district are raised to acceptable condition within two years.

§ 162.1100.

*Fifth*, and finally, while § 162.1100.12 provides for the Transitional School District to be dissolved on July 1, 2008, the legislature vested the State Board of Education with the discretion to extend, terminate, or re-establish the TSD "at any time" if it finds such action is necessary to "accomplish[ ] the purposes for which it was established."

The governing structure of the Transitional School District, following the district's loss of accreditation, is not identical to the structure of the St. Louis Board of Police Commissioners, which the Missouri Supreme Court addressed in *Smith*. But like the Police Board at issue in *Smith*, § 162.1100 subjects the Transitional School District to significant and pervasive State control, completely unlike the

13

governance of any other school district in the State. Significantly, the State's assumption of control over the Transitional School District specifically displaces, and supersedes, the authority formerly exercised by the district's locally elected school board. On loss of state accreditation, the member of the TSD's governing body appointed by the elected local school board is removed, and is replaced by a gubernatorial appointee who exercises all of the powers of a district superintendent. Section 162.1100 explicitly provides that the new chief executive officer need not be a district resident, that the chief executive officer shall have a guaranteed three-year term of office, and that his or her compensation will be set by the State – not by the Transitional School District.

Section 162.1100 specifically transfers all of the powers and responsibilities previously invested in the locally elected school board to the Special Administrative Board of the Transitional School District, except for "auditing and public reporting powers." § 162.621.2. The Special Administrative Board is given a series of additional powers, many of which could fundamentally alter the manner in which the district operates, such as the power to "explor[e] . . . alternative forms of governance for the district," to contract with nonprofit corporations to operate the district's schools, and to submit plans to voters to restructure the district's operations. § 162.100.4(2), (3), (6). The Transitional School District is given unique taxing powers, which are not subject to locally approved tax abatements or tax increment financing, or to the statutory provisions generally applicable to school district tax levies. Section 162.1100 imposed numerous additional, unique obligations on the Special Administrative Board, and specifies that the Special Administrative Board's performance of many of these additional duties "shall be subject to review and approval of the state board of education." § 162.1100.6(1), (2), (5). The State Board of Education is given wide discretion to continue, terminate, or resurrect the Transitional School District "at any time." § 162.1100.12.

14

The mandatory takeover of the St. Louis Public School District by the Special Administrative Board on the district's loss of accreditation, and the statutory provisions governing the operations of the Special Administrative Board, are wholly unlike the statutory provisions applicable to other Missouri school districts which may lose their State accreditation. When any *other* school district in Missouri loses its State accreditation, the State Board of Education has several options at its disposal. It may: allow the existing board of education to continue to govern the district, with greater oversight; appoint a special administrative board to operate all or part of the district; determine an alternative governing structure; attach the district to another district(s); or establish one or more new school districts within the territory of the lapsed district. § 162.081.3. If a special administrative board is appointed, that special administrative board's only statutory responsibility is to operate the school district (or the part of the district it was appointed to govern) until the district is accredited for two consecutive academic years. § 162.081.3(2)(a). The special administrative boards which *may* be appointed in other Missouri school districts are not subject to the numerous requirements, or levels of State control, imposed on the Transitional School District.

Using *Smith*'s "structural analysis," we conclude that the State's pervasive control renders the Transitional School District an "agency of the state" for purposes of Legal Expense Fund coverage.

**C.**

Additional support for our conclusion comes from a statute which expressly provides that *other* special administrative boards are *not* covered by the Legal Expense Fund.

As discussed in § I.B, above, the State Board of Education is authorized (but not required) to appoint a special administrative board or other alternative governing body when other Missouri school districts lose their State accreditation.

15

*See* § 162.081.3. The statute providing this authority with respect to *other* school districts explicitly provides:

> ***Neither the special administrative board nor any other form of governance appointed under this section nor its members or employees shall be deemed to be the state or a state agency for any purpose, including section 105.711, et seq***. [(the Legal Expense Fund statute)]. The state of Missouri, its agencies and employees shall be absolutely immune from liability for any and all acts or omissions relating to or in any way involving the lapsed district, a special administrative board, any other form of governance appointed under this section, or the members or employees of the lapsed district, a special administrative board, or any other form of governance appointed under this section. Such immunities, and immunity doctrines as exist or may hereafter exist benefitting boards of education, their members and their employees shall be available to the special administrative board or any other form of governance appointed under this section and the members and employees of the special administrative board or any other form of governance appointed under this section.

§ 162.081.5 (emphasis added).

Section 162.081.5's exemption of special administrative boards from Legal Expense Fund coverage is limited to special administrative boards "appointed under this section." "'Where several words are followed by a clause as much applicable to the first and other words as to the last, the clause should be read as applicable to all.'" *Spradling v. SSM Health Care St. Louis*, 313 S.W.3d 683, 688 (Mo. 2010) (quoting *Norberg v. Montgomery*, 173 S.W.2d 387, 390 (Mo. 1943)); *accord, State v. Champagne*, 561 S.W.3d 869, 873–74 (Mo. App. S.D. 2018); *see generally* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012). The language of § 162.081.5 is very similar to the language of the statute at issue in *Norberg*, which specified that the term "accounting officer" meant "the county clerk, county comptroller, county auditor, accountant *or other officer or employee keeping the principal records of the county*." § 10934, RSMo 1939. The Supreme Court held that the phrase "keeping the principal records of the county"

16

applied to all of the listed officers in the series, not *just* to the final phrase ("other officer or employee"). Here too, the phrase "the special administrative board nor any other form of governance appointed under this section" must be interpreted to mean that the immunity provisions of § 162.081.5 apply only to governing bodies "appointed under" § 162.081 itself.

The Special Administrative Board of the Transitional School District of the City of St. Louis was *not* "appointed under" § 162.081. Instead, the Special Administrative Board at issue here was appointed under § 162.1100, which provides for a very different appointment process (three members, one appointed by the governor, one by the mayor, and one by the president of the City's board of aldermen) than under § 162.081 (five or more members, all appointed by the State Board of Education). Therefore, the specification in § 162.081.5, that "the special administrative board . . . appointed under this section . . . shall [not] be deemed to be . . . a state agency for [the] purpose [of] section 105.711," does *not* apply to the Special Administrative Board at issue in this case.[4]

The fact that the General Assembly expressly excluded *other* special administrative boards from Legal Expense Fund coverage strongly suggests that the opposite result should apply here, where no express statutory exclusion applies. "The legislature's use of different terms in different subsections of the same statute is presumed to be intentional and for a particular purpose." *State v. Moore*, 303 S.W.3d 515, 520 (Mo. 2010) (citation omitted); *accord*, *Alberici Constructors, Inc. v.*

---

[4] We recognize that § 162.081.5 was amended in 2019, to expressly apply not only to a special administrative board, but also to "any other form of governance appointed under this section." *See* H.B. 604, 100th General Assembly, 1st Regular Session (2019). But even before the 2019 amendment, § 162.081.5 was applicable only to "[a] special administrative board appointed under this section." § 162.081.5, RSMo 2016. Even under this earlier version of § 162.081.5, the statement that "the special administrative board . . . shall [not] be deemed to be . . . a state agency for [the] purpose [of] section 105.711" was inapplicable to the Special Administrative Board of the Transitional School District of the City of St. Louis.

17

*Dir. of Revenue*, 452 S.W.3d 632, 637 (Mo. 2015) (citing *Moore*); *Am. Civil Liberties U. of Mo. v. Ashcroft*, 577 S.W.3d 881, 892 (Mo. App. W.D. 2019) (ascribing significance to the "sharp contrast" between the powers given to the Secretary of State to review referendum petitions under §§ 116.120 and 116.332). The fact that § 162.1100 does not expressly exclude Legal Expense Fund coverage for the Special Administrative Board of the Transitional School District, when such an express exclusion apparently applies to *every* <u>other</u> special administrative board which might be established in Missouri, is significant.[5]

**D.**

In determining whether the Special Administrative Board of the Transitional School District is an "agency of the state," it is also significant to recall that this unique entity has its genesis in the settlement of a lawsuit in which <u>the State</u> – not just local entities – was held liable, and acknowledged its responsibility, for the decades-long maintenance of racially segregated schools in the City of St. Louis. Thus, when the Transitional School District was established by § 162.1100, it was intended to discharge <u>the State</u>'s obligation to remedy the historical segregation of St. Louis' public schools; the TSD was not established merely as a mechanism to enable local authorities to remedy a local problem.

As the Eighth Circuit recognized in reviewing the history of the desegregation lawsuit:

> In 1972, the plaintiffs brought an action against the Board of Education of the City of St. Louis (City Board) alleging that the city schools were segregated by race as a matter of state law and practice.

---

[5] As explained in § I.B, above, special administrative boards appointed under § 162.081 are subject to substantially less State control than the Special Administrative Board for the Transitional School District of the City of St. Louis. The legislature nevertheless felt the need to specify in § 162.081.5 that these *other* special administrative boards were not "agencies of the state" for purposes of Legal Expense Fund coverage. The fact that the legislature felt it necessary to expressly exclude Legal Expense Fund coverage for entities subject to *lesser* State control than the TSD, supports our conclusion that the TSD is itself an "agency of the state."

> Thereafter, the State of Missouri was joined as a party defendant. We
> . . . [held] that prior to 1865 the State prohibited the creation or
> maintenance of schools for teaching black children to read or write and
> that, after that date until 1980, the City Board and the State were
> jointly responsible for maintaining a segregated school system. We
> further noted that the City Board and the State failed to take effective
> measures to desegregate the school system in the years immediately
> following *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98
> L.Ed. 873 (1954).

*Liddell by Liddell v. Bd. of Educ. of City of St. Louis*, 126 F.3d 1049, 1051–52 (8th

Cir. 1997) (other citations and footnote omitted). The enactment by the State of

§ 162.1100 "was a vital component of the settlement agreement disposing of the

federal desegregation litigation concerning St. Louis' public schools." *Bd. of Educ.*

*of City of St. Louis*, 271 S.W.3d at 10. The Missouri Supreme Court held that,

"'[g]iven the long history of state-mandated, segregated schools [in Missouri], the

complexity of the issues, and the difficulty of developing a plan that will ensure that

students of all races will have a continuing equal opportunity for a quality,

integrated education' the state possessed a substantial justification and an

important interest in reaching a settlement to dispose of the pending federal

litigation." *Id.* (quoting *Liddell*, 126 F.3d at 1056).

In its order approving the settlement of the desegregation lawsuit, the

district court noted that Missouri's Attorney General had personally appeared

before the court, and acknowledged *the State's* responsibility for the segregation of

St. Louis' public schools:

> At the [settlement-approval] hearing, the Attorney General accepted
> blame on behalf of the State for past segregation in its public schools
> and apologized for this inequity. He noted that the continued funding
> provided for by the state legislature in SB 718 was evidence that this
> was not an empty apology.

*Liddell v. Bd. of Educ. of City of St. Louis*, No. 4:72CV100 SNL, 1999 WL 33314210,

at *3 (E.D. Mo. March 12, 1999); *see also id.* at *7 ("The Missouri Attorney General

has apologized in open court for past state constitutional transgressions.").

19

The Transitional School District was created to remedy past wrongs committed by _the State_, as part of the settlement of a long-running lawsuit in which the State was a principal defendant. The TSD's unique role in the resolution of the St. Louis school desegregation litigation distinguishes it from every other school district in the State, and supports our conclusion that it is an "agency of the state" for purposes of § 105.711.

**E.**

In arguing for reversal, the State relies heavily on our decision in _P.L.S. ex rel. Shelton v. Koster_, 360 S.W.3d 805 (Mo. App. W.D. 2011). _P.L.S._ addressed the question whether a typical Missouri public school district (there, the Doniphan R-1 School District) qualified as an "agency of the state" for Legal Expense Fund purposes. 360 S.W.3d at 808. _P.L.S._ concluded that the school district did _not_ constitute an "agency of the state," and was therefore not entitled to Legal Expense Fund coverage.

While the issue decided in _P.L.S._ has obvious superficial similarities to the issue we address here, we conclude that _P.L.S._ is distinguishable, given the radically different structure of the Transitional School District as compared to a typical accredited Missouri district. _P.L.S._ recognized that school districts are "'part of state government,'" and that they are "governmental instrumentalities of the state and serve important governmental purposes." 360 S.W.3d at 813 (citations omitted). The Court emphasized, however, that school districts are "political subdivisions" of the state, and that, "like other political subdivisions authorized by law, [school districts are] generally formed by the vote of the citizenry in the geographic area desiring to establish the district." _Id._ (citing § 162.211). "'The subdivision of the state into counties and school districts [is to] . . . enable the people of the territory . . . to govern and manage their own local affairs.'" _Id._ (citation omitted)

20

*P.L.S.* noted that "[t]he phrase 'state agency' or 'agency of the state,' in statutory and legal terminology, often refers to a division or a department of state government performing (typically) the functions of the executive branch of state government." 360 S.W.3d at 815. The Court observed that school districts did not neatly fall within this conception of a "state agency": "School districts are not typically regarded as a division or department of state government, but, as already mentioned, are considered legally separate, special-purpose, local governmental subdivisions with powers similar to those of a town, village, or county, including the ability to levy taxes." 360 S.W.3d at 815. Despite the pervasive State regulation of the functioning of public schools, the Court held that school districts were not thereby rendered "state agencies":

> It is true that the school districts have a separate legal existence from the municipalities and counties in which they are situated, and it is true that the curriculum and various activities of school districts are regulated in various ways by the state, but, as we have noted, the school districts generally become a legal entity by the action of the constituent voters, who also elect governing board members. The school district voters thus share oversight of the school district with the state board of education and the legislature. The district is certainly not exclusively answerable to the governor and the legislature. The hiring of employees, including bus drivers, the levying of taxes, and so forth, are also subject to the control of the citizen constituency in the district through their elected representatives.

*Id.* at 818 (footnote omitted).

The Court in *P.L.S.* expressed its concern that, if it held that the Legal Expense Fund was responsible for defending and indemnifying tort claims brought against the employees of a typical school district, then the Legal Expense Fund would become responsible

> for the defense and indemnity of employees of every public entity, including every political subdivision, whether a county library, a school district, a municipality, a public corporation, a sewer district, a village, a township, and so forth, as well as every executive agency of the state. In other words, the Commissioner of Administration would be quite

21

busy with coverage issues as to every governmental entity within the state, from the tiniest sewer district to the largest municipality.

360 S.W.3d at 818-19.

The considerations animating our decision in *P.L.S.* are simply not present here. While denominated a "political subdivision" of the State, the Transitional School District was _not_ "formed by the vote of the citizenry in the geographic area desiring to establish the district." Moreover, the purpose of the District's creation was _not_ to "enable the people of the territory . . . to govern and manage their own local affairs," but instead to allow _the State_ to remedy constitutional violations for which _the State_ was directly responsible. Moreover, in the Transitional School District, "[t]he hiring of employees, . . . the levying of taxes, and so forth, are [_not_] subject to the control of the citizen constituency in the district through their elected representatives." To the contrary, as we have explained above, the Transitional School District is rendered exempt from many of the statutes governing the levying of taxes in typical school districts; its superintendent (who has primary responsibility for personnel decisions) is a gubernatorial appointee with a three-year term who need not even be a district resident; and the school district's operating decisions are _not_ subject to local control through the people's elected representatives. Finally, *P.L.S.*'s understandable concern that it would "open the floodgates" and make the Legal Expense Fund responsible for every public entity in the State is simply not implicated here: the Special Administrative Board of the Transitional School District is a unique entity in the State, the sole member of a class of one. Our holding that the actions of its employees are covered by the Legal Expense Fund will have limited significance beyond the confines of this particular entity (which has not operated the St. Louis Public School District since 2017).

Point I is denied.

22

## II.

In its second Point, the State argues that the circuit court's grant of summary judgment was improper because a factual dispute exists as to whether S.M.H.'s abuser (former teacher Allen Merry) tendered defense of S.M.H.'s lawsuit to the State.

Section 105.716.2 requires persons covered by the Legal Expense Fund to cooperate with the State's investigation and defense of any claim:

> All persons and entities protected by the state legal expense fund shall cooperate with the [State] attorneys conducting any investigation and preparing any defense under the provisions of sections 105.711 to 105.726 by assisting such attorneys in all respects, including the making of settlements, the securing and giving of evidence, and the attending and obtaining witness to attend hearings and trials. Funds in the state legal expense fund shall not be used to pay claims and judgments against those persons and entities who do not cooperate as required by this subsection.

"Essential to any such cooperation is that the defense of a claim be tendered to the attorney general so the attorney general can control the defense and settlement of covered claims as the statute requires." *Vasic v. State*, 943 S.W.2d 757, 759 (Mo. App. E.D. 1997). "The failure of a defendant to tender defense to the Attorney General and cooperate with the Attorney General in his defense prevents payment from the Fund." *Sherf v. Koster*, 371 S.W.3d 903, 908-09 (Mo. App. W.D. 2012) (citing *Vasic*).

In support of her summary judgment motion, S.M.H. submitted two exchanges of correspondence to establish that Merry had, in fact, tendered defense of S.M.H.'s claims to the State. In the first exchange, from 2015, her attorney wrote by e-mail to the Solicitor General in the Office of the Attorney General. In his e-mail, S.M.H.'s counsel stated that "[i]t is our understanding that Allen Merry has requested the Attorney General's Office defend him in [S.M.H.'s] litigation, and he has tendered his defense to your office. [¶] Has the office made a coverage

23

determination . . .?"  In response, the Solicitor General stated that "we declined Mr. Merry's request, telling him that the case did not fall within LEF coverage."

The second exchange of correspondence occurred in 2018, before the circuit court's entry of a default judgment against Merry.  In a January 26, 2018 letter to the Attorney General, S.M.H.'s counsel wrote:

> [Merry's] defense has been tendered to your office on no fewer than two occasions.  We have written you on numerous occasions affording your office ample opportunity to enter an appearance on his behalf.  We requested numerous continuances in furtherance of those efforts.  He is now in default.
>
> We have filed the enclosed Motion for Default Judgment and Entry of Judgment.  On March 6, 2018 at 10:30 a.m., the Motion will be heard and ruled upon in Division 20.  The Court will hold a hearing on damages only.
>
> We will then make a demand on the Missouri State Treasurer and the Legal Expense Fund for the damages awarded to our client. This is your last opportunity to enter an appearance on behalf of Mr. Merry.

The Attorney General's First Assistant and Solicitor responded on March 2, 2018:

> As you know, during Attorney General Koster's tenure, [which ended on January 1, 2017,] then-Deputy Attorney General Joseph Dandurand concluded that the State Legal Expense Fund ("LEF") does not provide coverage to Mr. Merry.  In particular, Judge Dandurand concluded that Mr. Merry was not an "officer or employee of the State of Missouri or any agency of the state."  § 105.711.2(2), RSMo.  In response to your recent correspondence, we have reexamined this coverage issue, and we have reached the same conclusion as did Judge Dandurand.  Thus, our Office will not approve any payments out of the LEF to satisfy a judgment against Mr. Merry, nor will our Office represent Mr. Merry in the above-captioned litigation.

In its response to S.M.H.'s summary-judgment motion, the State did not dispute the veracity of the correspondence on which S.M.H. relied to prove that Merry had made an adequate tender.  Instead, the State submitted the affidavit of an Executive Secretary in the Attorney General's Office, who had begun her employment in the office in June 2018.  The Executive Secretary stated that her

duties included serving "as custodian of the records recording communications related to incoming civil matters submitted to the Office of the Attorney General." The Executive Secretary testified that the records in her custody "begin in 2009 and go to December 20, 2018." The Executive Secretary testified that she had searched the records in her custody, and found "no record of Allen P. Merry communicating with the Office of the Attorney General," and "no record of Allen P. Merry tendering any defense with the Office of the Attorney General."

The State argues that this record creates a genuine issue of material fact concerning whether Merry satisfied his statutory obligation to tender the defense of S.M.H.'s claims to the State. We disagree. S.M.H.'s summary judgment evidence established that Merry had requested a defense of S.M.H.'s claims from the State in 2015, but that his request was refused based on the Attorney General's determination that Merry was not covered by the Legal Expense Fund. The 2018 correspondence confirmed that the Attorney General's Office had made a "no-coverage" determination prior to 2017, and that, immediately before the default-judgment hearing, the Office persisted in the view that S.M.H.'s claims were not covered by the Legal Expense Fund.

Thus, S.M.H.'s evidence establishes that the State was given a timely opportunity to assume Merry's defense, but instead made (and persisted in) a determination that Merry was not covered by the Legal Expense Fund. This was sufficient to establish, as a matter of undisputed fact, that Merry had tendered the defense of S.M.H.'s claims to the State.

The affidavit submitted by the State in opposition to S.M.H.'s motion did not dispute S.M.H.'s evidence, or create a disputed factual issue requiring a trial. The State's affidavit merely established that no record of Merry's tender of S.M.H.'s lawsuit could be located within a file or database of "communications related to incoming civil matters." The State's affidavit did not contest the authenticity of the

25

correspondence S.M.H. submitted – it only indicated that copies of that correspondence could not be located in a particular records management system within the Attorney General's Office.

In these circumstances, the circuit court did not err in concluding that S.M.H. had established, as a matter of undisputed fact, that Merry had tendered the defense of S.M.H.'s claims to the State, as required by § 105.716.2.

Point II is denied.

## Conclusion

The judgment of the circuit court is affirmed.

_____

Alok Ahuja, Judge

All concur.

26